R. K. PIEL, on behalf of himself and all others similarly situated

v.

NATIONAL SEMICONDUCTOR CORPORATION, Charles E. Sporck and Peter J. Sprague.

Civ. A. No. 77–4244.

United States District Court, E. D. Pennsylvania.

March 21, 1980.

Richard D. Greenfield, Sterling H. Schoen, Jr., Greenfield & Schoen, P.C., Bala Cynwyd, Pa., for plaintiff.

Seymour Kurland, Ian A. L. Strogatz, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

### I. *Introduction*

Before the Court is the motion of the plaintiff pursuant to F.R.Civ.P. 23(c)(1) for an order determining that the Complaint involved in this litigation and commenced on behalf of similarly situated persons should proceed as a class action. The class that the plaintiff proposes to represent would be defined as consisting of all persons or entities who purchased the common stock of the defendant National Semiconductor Corporation [hereinafter "NSC"] during the period between approximately July 1, 1976 to March 1, 1977 and who sustained damages thereby, whether by selling such securities at reduced prices, continuing to hold them at reduced market values, or otherwise.

The essence of the plaintiff's Complaint alleges that the defendants Charles E. Sporck [hereinafter "Sporck"] and Peter J. Sprague [hereinafter "Sprague"], President and Chairman of the Board of NSC, respectively, engaged in a conspiratorial course of conduct to artificially inflate the value of NSC stock in order to permit Sporck and Sprague to dispose of their privately owned

shares at the inflated value. The plaintiff contends that the defendants Sporck and Sprague actively misrepresented and failed to disclose facts that hindered potential and actual investors from gaining an accurate portrayal of the financial condition of NSC and that as a result many investors sustained losses when the market finally reflected the actual value of the stock. The plaintiff seeks to represent the class in rectifying this alleged securities violation because on October 1, 1976, he purchased 500 shares of NSC common stock at $35.75 per share and subsequently sold these same shares on February 3, 1977, at the price of $19.50 per share, a loss of $16.25 per share.

The Complaint instituting this litigation was filed on December 13, 1977, several months after the plaintiff had sold his shares of NSC common stock. Apparently, the plaintiff had considered various forms of legal recourse at an earlier date but was without sufficient legal or factual knowledge to pursue them independently. He, therefore, retained Richard D. Greenfield, Esquire, for the express purpose of unearthing the facts that occasioned his financial loss and ascertaining whether a legal remedy was available. Ultimately, a Complaint was prepared and ratified by the plaintiff which commenced this litigation.

## II. *Factual Summary.*

NSC is engaged in a high-technology industry that requires the continuing expenditure of considerable amounts of funds for research, design development and product improvement. Prior to 1977, NSC enjoyed a reputation as one of the most thriving growth companies in the Nation and had quintupled its sales from the proceeding four years. Its commercial and consumer product lines included computer memory components and systems for various models, microprocessors, certain circuits and modules for calculators, digital watch and clock manufacturers, optoelectric products, transducers and supermarket point-of-sale equipment. These products were manufactured in several world-wide locations, among them Bangkok, Thailand; Hong Kong; Malaysia; Scotland; and Santa Clara, California.

According to the plaintiff's allegations and a number of exhibits presented by both parties in their memoranda, NSC was unexpectedly besieged with several intra-company problems in mid-1976 to early-1977 that, perhaps, may be labelled as "growth pains." The Court is not immediately concerned with the exact nature of these production and financial difficulties[1] but rather narrows its attention to statements made by the defendants Sporck and Sprague during the time period involved. In an effort to avoid alienating itself from what would appear to be the gist of the plaintiff's Complaint—nondisclosures—the Court will maintain awareness of the time gaps between events as well as the events themselves.

On May 26, 1976, a news release emanated from NSC providing information that the Bangkok, Thailand plant which manufactured watch modules and various types of integrated circuits was undergoing labor problems and had been temporarily closed. The release further stated that the products manufactured in Bangkok were also manufactured at other plants that were increasing production activity. Although these plants could attempt to compensate for the effect of the shutdown, NSC predicted a diminishment in sales for the fourth fiscal quarter of 1976, ending May 31, 1976.

As predicted, the Bangkok shutdown did effect fourth quarter sales and thus directly the fiscal-year profits of NSC. In a New York Magazine article dated July 12, 1976, the defendant Sprague told an interviewer

---

1. The scope of judicial inquiry is limited to a securities fraud context by the allegations contained in the plaintiff's Complaint. The plaintiff has brought this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 adopted by the Securities and Exchange Commission. To endeavor an inquiry into the nature of NSC's production and financial misfortunes would produce, according to the plaintiff's allegations, a focus similar to that required by derivative action suits for, possibly, corporate mismanagement. This is clearly not the substance of the plaintiff's charge, nor is it suggested by the facts.

to expect a $1.45 price-earnings multiple for the fiscal year, down 20¢ from original Wall Street projections. Perhaps in an effort to buttress the company's image, however, the defendant Sprague continued:

"Whether National slips 20 percent or gains 20 percent, it's still traveling on a very fast bus."

He attributed the earnings shortfall to mounting expenses, namely the addition of some 4,000 employees in the last four months. *Since National Semiconductor is planning to add another 7,000 workers over the next ten to twelve months, it struck me that more earnings disappointments could be on the way. Not so, Sprague insists: "we're paying the bill now for a higher level of sales and earnings that has yet to be achieved. But these expenses won't be relevant six months out, since the semiconductor business (75 percent of company sales) is going into a boom mode.* Semiconductors are now in a shortage situation and it's getting worse. *And with prices stabilizing, our profit margins are bound to improve."*

*According to Sprague, earnings of about $2.75 a share are a "reasonable expectation" for fiscal 1977.* Further, he expects fiscal-1977 volume to top $500 million, versus an estimated $320 million in fiscal 1976. The strength of the semiconductor business is such, Sprague said, that it should offset any problems that may arise from competition in such consumer electronics as digital watches and pocket calculators (about 20 percent of sales). (Emphasis added).

Dorfman, New York Magazine, July 12, 1976, at 12, col. 3. The interview comprising the substance of this article was held on July 9, 1976.

NSC issued another News Release and its Annual Report in late July, 1976, in both of which it announced manufacturing problems with its semiconductor digital watch components. The predicted effect of this was that there would be a reduction in output which would effect sales and earnings throughout the first quarter of fiscal-

year 1977. An improvement was expected during the second quarter but Sporck was quoted as saying: "[T]he first quarter dollar loss in chip, module and finished watch production for this product line will be difficult to make up during the Company's fiscal year which ends May 31, 1977." (Emphasis added). A literal reading of this statement would appear to lend itself to a limited interpretation that only profits attributable to this particular product line would be effected rather than total company profits from the combined yields of all product lines. This interpretation would appear to be consistent with the closing paragraph of the defendants Sporck's and Sprague's letter to the stockholders contained in the Annual Report:

In summary, fiscal 1976 was a year of resolution and growth for National despite the industry's downturn during the first half. We enlarged our manufacturing capacity; we increased our production processing capabilities; we expanded our product line and customer base; we entered new markets; we increased our sales and earnings. All of these form a solid foundation for our entry into fiscal 1977 and it should be an exciting year.

On July 30, 1976, the problems detailed in the aforementioned News Release and Annual Report were announced by the Company at a widely attended analyst meeting. Again it predicted a depressed level for the first quarter but that there would be a significant rebound in the second quarter. Stock market analysts generally remained optimistic and predicted that NSC would perform well over its fiscal year, preferring to rely upon NSC's corporate history and outstanding reputation as a growth company rather than the several recent negative occurrences. Kidder, Peabody & Co., in an August 30, 1976 research memorandum, stated that regardless of these setbacks

we now anticipate earnings per share of $2.00, compared with the earlier projections of $2.60 and $1.44 reported for 1976. Revenues are expected to rise to $452 million, from $325 million in 1976. In June, prior to the emergence of the watch problem, management announced that

revenues of around $500 million were possible in 1977.

A similar type of memorandum was circulated on September 16, 1976, by Bache, Halsey, Stuart [hereinafter "Bache"].[2]

The Annual Shareholders' Meeting, held on September 24, 1976, followed this manifested optimism expressed by the financial world. At this meeting, the defendant Sporck informed those in attendance that first-quarter earnings would be less than expected but that improvements would cause better results in the second quarter. Sporck also stated that other product lines were proving as profitable as planned and that he expected a "booking growth" in the Fall, 1976. Approximately one week later Sporck confirmed these statements in another News Release and added further:

"We still expect that net earnings for National's entire fiscal year will be above the $1.44 per share level reported for fiscal 1976 because of the correction of the watch situation and the fact that all other facets of the Company—semiconductor and supermarket point-of-sale— are performing well."

On October 1, 1976, the plaintiff contacted a stock broker named Craig Muff [hereinafter "Muff"], who was connected with the Bache firm. Muff advised the plaintiff to purchase NSC stock and, accordingly, the plaintiff directed him to purchase 500 shares at the market price of $35.75. The plaintiff has alleged that he relied solely upon Muff's advice in matters governing his acquisition. Moreover, the plaintiff contends that he possessed no particular knowledge of NSC and its financial and operational state not possessed by the ordinary layman investor.

A period of approximately three months elapsed before another statement issued from the defendants. On January 6, 1976, a News Release was circulated containing dollar amounts and percentages suggesting that earnings for the second quarter of fiscal-year 1977 were 40% below the earnings reported for the same time period in 1976. Although Sporck declared that the profits for the first half of the fiscal year were "disappointing," he added that the second quarter earnings reflected a 39% increase in the rate of profit per week over the Company's fiscal quarter ending on September 19, 1976. The NSC Financial Statement for the Second Quarter of 1977 followed this release and was made public on January 10, 1977. This statement, although remaining generally optimistic, was consistent in content with the release and summarized its fiscal year 1977 position as follows:

National's financial performance during the first half of the current fiscal year has been disappointing to the entire management team. Vigorous profit improvement steps are being taken. We expect that our second half performance will show continuing improvement; *however, exceeding last year's total earnings will be a challenge unless there is a significant upturn in the overall economy.*

Longer term, we have great confidence in the growth and return on investment opportunities which lie ahead for the Semiconductor industry and for National. We are continuing to focus on introducing innovative new products; devices are spreading into markets where they have never been used before. (Emphasis added).

On January 28, 1977, another News Release was issued from NSC in which Sporck predicted that earnings for the third quarter ending March 6, 1977 would be significantly below that of the previous quarter. Sporck expected a substantial near-term decline in profits but projected a long-term growth for NSC.

The plaintiff, apparently aware of this barrage of information concerning NSC's misfortunes and, of course, cognizant of the continuing reduction in the stock market

---

**2.** The reports of these financial investment firms are offered because they provide an important element to gaining an awareness of the chronology of events comprising the substance of the plaintiff's claims. Their relevance is limited to that area in this class determination although they may re-surface should the Court later consider substantive issues.

value, sold his 500 shares on February 3, 1977. The sales price for these shares was $19.50.

The final event proffered by the plaintiff as contributing to the substance of the charges alleged is contained in a February 28, 1977 article published in Business Week. In this article it was explicitly stated that NSC had been besieged with a variety of production and management problems over a period including approximately the entire 1976 calendar year. Moreover, it was noted that the 1977 fiscal-year profits would be far from approaching the $2.75 per share predicted by Sporck in early July, 1976. The impact of the article overall may be best exemplified by the following excerpt:

Now National is on the verge of losing that image. With one piece of bad news after another in the last 12 months, National has badly tarnished its reputation for both manufacturing efficiency and management acumen. *Far from doubling its earnings this fiscal year, the company will be hard pressed even to equal last year's performance.* National's profits were off nearly 40% in the six months ended Dec. 12, and its stock was recently battered as low as $19. One competitor, once an outspoken admirer of National's strategy, now is having second thoughts. "They may be spreading themselves too thin," warns W. Jerry Sanders III, president of Advanced Micro Devices Inc. (Emphasis added).

*Dog Days at National Semiconductor*, Business Week Magazine, February 28, 1977, at 70, col. 1. In addition to these fiscal difficulties, the article continued by outlining the several causes for the Company's production problems and by noting that there had been three general managers in recent times, including, for one brief period, Sporck himself. The article continued on the upswing and considered these various problems solved by recent management decisions.[3]

3. This factual summary is based on facts presented by the parties in a class determination context, which may be quite apart from facts adduced for pre-trial motions and, later, if

## III. *Class Action Certification.*

### A. *F.R.Civ.P. 23(a) Requirements.*

F.R.Civ.P. 23(a) provides several principles for class determinations. The factual summary provided will be applied to these principles to permit the Court to render such a determination and, ultimately, a certification.

■ The applicability and utility of the class action device to cases involving the securities laws has been cogently recognized on a number of occasions. The nature of the securities laws is complex and litigation therein concerned expensive. Without the class action device, many actionable wrongs would go uncorrected and persons affected thereby unrecompensed. In essence, the class action device is a *bona fide* method for redressing violations of the securities laws and for compelling compliance with their mandates. *Kahan v. Rosenteil*, 424 F.2d 161 (3d Cir. 1970). Accordingly, "the interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action." *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968).

■ When an action has been filed on behalf of a class, the Court must apply the requirements specified in F.R.Civ.P. 23(a) to determine its appropriateness. All the requirements enumerated must be satisfied by the proponent of certification before a class action determination may be made. *See, e. g., Katz v. Carte Blanche Corp.*, 496 F.2d 747 (3d Cir. 1975); *Chevalier v. Baird Savings Ass'n*, 72 F.R.D. 140 (E.D.Pa.1976). F.R.Civ.P. 23(a) provides:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative

necessary, for trial. Therefore, the Court will only recognize this chronology for the limited purpose of determining a class.

parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The Court, when properly exercising its discretion, may consider the pleadings and facts procured through the discovery process to "identify the character or type (but not the merits) of . . . plaintiff's claim and then to determine whether there was a class to which such claim of the plaintiff was common and of which it was typical, sufficiently numerous to justify class certification." *Doctor v. Seaboard Coast Line Railroad Co.*, 540 F.2d 699, 708–09 (4th Cir. 1976). In order to determine whether certification is appropriate, the foregoing requirements will be applied to the facts presented in the instant case.[4]

■ 1. *Numerosity.* F.R.Civ.P. 23(a)(1) prescribes that in order to certify a class it must be "so numerous that joinder of all members is impracticable." What is considered "impractical" is of course a subjective determination although the indicia of the number of parties involved, the expediency of joinder and the inconvenience of trying individual suits provide guidance. *See* 7 Wright & Miller, *Federal Practice and Procedure, Civil* § 1762, p. 602.

■ Plaintiff proposes a class that would consist of all persons or private entities who purchased stock of the defendant NSC during the period between July 1, 1976 and March 1, 1977, and who sustained damages therein. During this period, trading of NSC stock was purportedly very active and the plaintiff has averred and later contended that the class consists of "at least several thousand persons." Complaint, ¶ 8. Because of these facts and allegations and the nature of the transaction involved, the Court has no difficulty holding that the potential number of class members is arithmetically numerous. *See In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322 (E.D.Pa.1976); *Buckles v. Weinberger*, 387 F.Supp. 328 (E.D.Pa.1974).[5] This informed assertion of the number of potential class members also satisfies the Court that joinder would be inconvenient and impractical and would work a burden upon the parties and the judicial system. *See Dawes v. Philadelphia Gas Com'n*, 421 F.Supp. 806 (E.D.Pa.1976); *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452 (E.D.Pa.1968).

2. *Adequate Representation.* The fourth enumerated requirement of F.R.Civ.P. 23(a) provides that the "representative parties will fairly and adequately protect the interests of the class."[6] In an effort to define this somewhat vague standard for representation, the Third Circuit has adopted the following rule to which a plaintiff must demonstrate his compliance:

(1) they have no interests which are antagonistic to other members of the class, and (2) their attorney is capable of prosecuting the instant claim with some degree of expertise.

*Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 247 (3d Cir. 1975); *Dorfman v. First Boston Corp.*, 62 F.R.D. 466 (E.D.Pa. 1973).

---

**4.** The requirements will not be examined in the sequence provided by F.R.Civ.P. 23(a), but rather in an order according to the extent that the contentions of the party vary. The requirements merely nominally contested will be considered first and the requirements more heatedly in dispute will be discussed last.

**5.** Although the plaintiff has supplied the Court merely with an informal estimate of the number of potential class members, the Court is cognizant of the principal that the exact number need not be averred. *See, e. g., Dolgow v. Anderson*, 43 F.R.D. 472 (E.D.N.Y.1968). For the purposes of the present case, the Court finds it sufficient that the plaintiff's estimate is an informed one and not the result of unwarranted speculation. When it becomes appropriate to effect notice to potential class members, NSC's records may be utilized to ensure accuracy.

**6.** The lack of complete concurrency of the dates of the plaintiff's procurement and retention of shares of NSC stock (October 1, 1976 to February 3, 1977) and the dates providing delineation of potential class members who purchased NSC shares of stock (July 1, 1976 to March 1, 1977) is noted. The overlap of these periods will be discussed *infra*.

The defendants apparently recognize the applicability of the rule articulated in *Wetzel* but offer a third requirement for adoption; that the plaintiff have first-hand knowledge of the facts giving rise to the cause of action. Essentially, the defendants contend that the plaintiff's counsel, Richard D. Greenfield, Esquire, is the real party in interest but for his lack of standing because he has unearthed the facts and unraveled the complexities attendant to their application to the securities laws. Reliance for this advancement is upon the decision rendered in *In re Goldchip Funding Co.*, 61 F.R.D. 592, 594–95 (M.D.Pa.1974):

> In my view, facts regarding the personal qualities of the representatives themselves are relevant, indeed necessary, in determining whether "the representative parties will fairly and adequately protect the interests of the class." . . . A proper representative can offer more to the prosecution of a class action than mere fulfillment of the procedural requirements of Rule 23. He can, for example, offer his personal knowledge of the factual circumstances, and aid in rendering decisions on practical and nonlegal problems which arise during the course of litigation. An attorney who prosecutes a class action with unfettered discretion becomes, in fact, a representative of the class. This is an unacceptable situation because of the possible conflicts of interest involved. . . .

*See also Levine v. Berg*, 79 F.R.D. 95 (S.D. N.Y.1978).

■ The *Wetzel* rule, as it presently obtains, implicitly recognizes that a class representative need not be the best of all possible representatives but rather one that will pursue a resolution of the controversy with the requisite vigor and in the interest of the class. What is "requisite" is determined by considering the nature of the litigation and the factual and legal basis underlying it; necessarily a case-by-case analysis. *See Apanewicz v. General Motors Corp.*, 27 F.R. Serv.2d 541 (E.D.Pa.1978). To require a person unschooled in the realm of our complex and abstract securities laws to have first-hand knowledge of facts cloaked in an alleged conspiratorial silence and which present themselves as a wrongdoing that may be actionable would render the class action device an impotent tool. In order to responsibly allege and later adequately prove the accusations contained in the plaintiff's Complaint, the plaintiff's counsel must have engaged in and will engage in extensive investigation and discovery conducted with a working knowledge of the securities laws. *See In re Magic Marker Securities Litigation*, 77 F.R.D 685 (E.D.Pa. 1977); *Chevalier v. Baird Savings Ass'n, supra*.

■ The Court is cognizant of the fact that by it not requiring the class representation to have the degree of first-hand knowledge of the factual basis of this litigation suggested by the defendants, that counsel may proceed without various restraints. The Court *In re Goldchip Funding Co., supra*, expressed a similar concern in its ruling to the effect that such unbridled discretion of counsel may render him a class representative rather than its counsel, thereby creating a conflict of interest. The Court is unmoved by this assertion. Aside from the normal degree of flexibility enjoyed by counsel when presenting a client's case, the Court may intervene, if appropriate, pursuant to its inherent power to protect the class members. Moreover, much influence and control is exercised by the Court by the fact that it controls the fee award to the plaintiff's counsel should the plaintiff prevail. In essence, the Court recognizes the existence of its inherent powers to control the actions of the plaintiff's counsel in the event that a conflict of interest appears. Otherwise, counsel for both parties may exercise the discretion they deserve and enjoy when presenting their respective clients' positions.

■ Ruling in accordance with the numerous cases that expressly reject the *In re Goldchip Funding Co., supra*, precedent and declining to adopt the defendant's proposed third requirement to the *Wetzel* rule, *see, e. g., Sharp v. Reybold Homes, Inc.*, 24 F.R.Serv.2d 1111 (E.D.Pa.1977), the Court

turns to the two existing requirements: (1) the representative has no antagonistic interests and (2) his counsel has the requisite expertise to prosecute the action. It is not disputed that the plaintiff carries no interest that could conceivably be considered antagonistic to the common interests of the class he seeks to represent. Accordingly, the Court deems this requirement satisfied. In addition, the second requirement is not contested and is therefore deemed satisfied. The plaintiff's counsel's ability to prosecute similar actions with a sufficient degree of expertise has been noted on at least one prior occasion. *Simon v. Westinghouse Electric Corp.*, 24 F.R.Serv.2d 1078 (E.D.Pa. 1977). The Court is of the opinion, and so rules, that the plaintiff is an adequate class representative pursuant to the requirements of F.R.Civ.P. 23(a)(4).[7]

3. *Common Questions of Law or Fact.* F.R.Civ.P. 23(a)(2) requires as a condition for class certification that "questions of law or fact common to the class" exist. This requirement has generally been permissively applied to a large variety of factual circumstances including allegations of conspiracy and securities fraud. 7 Wright & Miller, *Federal Practice and Procedure, Civil* § 1763. The permissive application may undoubtedly be attributed to the premise earlier related—that is, in doubtful cases, the Court should favor the certification of the class. *Kahan v. Rosenstiel, supra; Esplin v. Hirschi, supra.*

In the present case, the plaintiff bases liability on the defendants' alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated by the Securities and Exchange Commission.[8] In order to establish civil liability for such violations the plaintiff must prove "knowledge by the defendants, intent to defraud (scienter),[9] failure to disclose to the plaintiff, materiality of the facts and, in some instances, reliance by the plaintiff." *Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 583 (3d Cir. 1975). This standard, outlining the proofs necessary to obtain a civil remedy, is provided in order for the Court to emphasize the framework in which it must determine whether common questions exist. The Court will not engage

---

**7.** When determining the adequacy of potential class representatives, courts must consider personal qualities such as vigor, tenaciousness and willingness to make a financial commitment. *See Sharp v. Reybold Homes, Inc.*, 24 F.R. Serv.2d 1111 (E.D.Pa.1977); *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685 (E.D.Pa.1977). In the present case the plaintiff has actively pursued his case on behalf of himself and potential class members as well as stated his willingness to make the financial commitment attendant to class notification and other aspects of a class action. Deposition of Raymond K. Piel, pp. 110, 120–22, 126.

**8.** The plaintiff also asserted common law grounds as justification for relief. Implicitly, however, counsel has withdrawn these state-based remedies by its failure to further advocate their applicability. Moreover, the Court rules that only the issues of law or fact based on the aforestated federal enactments or promulgations are common to the class as well as manageable for the Court's ultimate resolution. In this regard, the issues existing in a common law fraud action may be quite apart from those necessarily proved in the federal securities law context.

 That the prima facie case each class member must establish differs from the traditional fraud action, and may, unlike the fraud action, be established by common proof, is ir-

relevant; although derived from it, the 10b–5 action is not coterminous with a common law fraud action.

*Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir. 1975).

It must also be recognized that because NSC was trading on the New York Stock Exchange during the proposed class period, purchases and thus potential class members from a considerable number of different states may be involved. Although the common law existing amongst the several states is not wholly inconsistent, there are sufficient deviations and permutations to render the case unmanageable should the common law issues remain. *See In re United States Financial Securities Litigation*, 64 F.R.D. 443 (S.D.Cal.1974).

**9.** The element concerning scienter as a part of the decision whether a fraud was actually perpetrated may constitute the focal point of the plaintiff's case and the defendants' defense. Whether the projections of future NSC earnings were made in good faith, recklessly or with "a mental state embracing intent to deceive, manipulate, or defraud" will be an issue of considerable import to the ultimate resolution of this controversy. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1974).

in a discussion of the merits of the plaintiff's case in relation to this standard. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974).

The earlier recitation of facts and, indeed, the brunt of the plaintiff's claims allege the existence of a conspiracy to maintain an inflated value of NSC common shares of stock. The proffered version advances the theory that, in essence, the defendants Sporck and Sprague made active misrepresentations in the early stages of the requested period that enhanced the desirability and thus the value of the common shares. During the middle and remaining portions of the requested period, the same defendants failed to disclose the true and realistic impact of a variety of negative business features that befell NSC. In essence, therefore, the plaintiff has alleged that the defendants' conduct constituted a common nucleus of operative facts or a single, unitary scheme, the total effect of which constituted a violation of the federal securities laws.

At the onset, the defendants challenge what they refer to as the plaintiff's "conclusionary allegations" of the existence of a conspiratorial course of conduct. They contend, first, that the plaintiff's "bare allegations" should not be accepted and, second, that even if they are accepted, the existence of a number of different representations over an extensive period of time precludes the possibility that issues may be common among the proposed class members. For the reasons that will follow, the Court rejects both of these assertions.

Again, the Court notes that it is improper for it to delve into the merits of the plaintiff's claim when making a class action determination. *Eisen v. Carlisle & Jacquelin, supra.* A potential class representative is not required to carry a civil burden of proof in the preliminary stages

such as a class determination. It is recognized, however, that "more than a mere allegation may be required." *Philadelphia Electric Co. v. Anaconda American Brass Co., supra*, at 458. Accordingly, the Court finds that the present factual posture of the case may "warrant a finding that plaintiff's claim . . . may have merit and is a genuine issue in this litigation." *Philadelphia Electric Co. v. Anaconda American Brass Co., supra*, at 458.[10]

The defendants' second contention is equally without merit and, moreover, has been expressly rejected by *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), and its progeny. In *Blackie*, the Court of Appeals for the Ninth Circuit was confronted with a similar situation wherein a number of misrepresentations occurred over a 27-month period and, in this regard, stated:

> The overwhelming weight of authority holds that *repeated misrepresentations of the sort alleged here satisfy the "common question" requirement.* Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that *the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable*, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit. (Emphasis added). (Citations omitted).

*Blackie v. Barrack, supra*, at 902. Implicit in this holding is the recognition that it should not be permissible for a defendant to escape the possible effect of a class action merely because the wrong alleged was elaborately conducted over a long period of time and by a variety of different activities. This concept was recognized in a case of equal import and reasoning, *Simon v. Westinghouse Electric Co., supra*, at 483–84, when it was stated:

> Y.1974). The Court, therefore, considers the commonality requirement satisfied in the instant case when the plaintiff has additionally endeavored to articulate specific instances of alleged misrepresentations. *See Blackie v. Barrack, supra.*

10. There exists a number of case decisions in which allegations that earnings or market values have been affected or maintained by misrepresentations have been held sufficient to satisfy the commonality requirement. *See, e. g., Werfel v. Kramarsky*, 61 F.R.D. 674 (S.D.N.

These issues [concerning the entire chain of events] therefore are common questions of fact for each purchaser within the class period. (Citation omitted). Of course, the existence and scope of the alleged conspiracy among the defendants in itself is a question common to the entire class.

See also *Brady v. Lac, Inc.*, 72 F.R.D. 22 (S.D.N.Y.1977); *Entin v. Barg*, 60 F.R.D. 108 (E.D.Pa.1974); *In re U. S. Financial Securities Litigation*, 64 F.R.D. 443 (S.D. Cal.1974); *Fischer v. Kletz*, 41 F.R.D. 377 (S.D.N.Y.1966).

Finally, another case closely approximating the facts of the present controversy and rejecting a claim by the defendants that because the misrepresentations occurred at different times the duties to purchasers varied accordingly and thus there was no commonality is *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 690–91 (E.D.Pa.1977). The Court there stated concisely that:

> Obviously, the underlying facts fluctuate over the class period and vary as to individual claimants. *This does not defeat a class action for Rule 23(a)(2) requires a showing of common questions of law or fact; it does not require identity of both facts and law.* (Emphasis added).[11]

The single, unitary scheme that the plaintiff alleges began on July 9, 1976, when the defendant Sporck was interviewed and declared that NSC was entering a "boom mode" and expected fiscal-year 1977 profits to approach $2.75 per share. The plaintiff alleges that this statement actively misrepresented the true state of NSC's financial and production status because it was, at the time, experiencing labor and technical problems at its key Bangkok, Thailand plant. Throughout the remaining portions of the class period, various misrepresentations were further issued containing optimistic predictions despite current problems which the plaintiff alleges were not completely disclosed. Also, during this time, months elapsed without information emanating from NSC. Finally, on January 28, 1977, a news release was issued that would, in the Court's view, constitute a sufficient inquiry notice or a retraction of NSC's earlier projections.[12]

As thus related, the Court designates the period beginning on July 9, 1977 and ending on January 28, 1977 as determinative of class membership.[13] In essence, therefore, the Court has concluded that the "plaintiff's claim . . . may have mer-

---

**11.** The defendants, *inter alia*, relied upon the decision in *Feldman v. Lifton*, 64 F.R.D. 539 (S.D.N.Y.1974) for the proposition that the "common nucleus of operative facts" or "single, unitary scheme" theories are limited to cases where purchasers are injured by the same misrepresentation. The court in *Cohen v. Uniroyal, Inc., supra*, expressly rejected that precedent and adopted the position of the Advisory Committee on the rule (23): "A fraud perpetrated on numerous persons by means of similar representations may be an appealing situation for a class action."

**12.** The Court views the news release of January 28, 1977 as the effective date of what may be considered a retraction of NSC's earlier projections. In this release, the defendant Sporck declared that "a substantial near-term decline in profits" was expected. Coupled with the January 10, 1977 issuance of the Financial Statement for the Second Quarter 1977, which related the challenge involved in exceeding the prior years earnings, the Court believes that the effect of the initial statements was sufficiently dissipated to warrant the designation of this date as the end of the class period.

**13.** The plaintiff had designated July 1, 1976 as the commencement date for the class period and March 1, 1977 as the termination date. Although the New York Magazine article that constitutes the first projection which is alleged to have been a misrepresentation did not occur until July 9, 1976, the plaintiff seeks to utilize the earlier date of July 1, 1976 because it is more convenient. Regardless of reference convenience, however, the Court designates July 9, 1976 as the class period commencement date. As for the termination date, the January 28, 1977 date is designated because it coincides with a news release issued from NSC in which it was stated that Sporck expected a near-term decline in profits. This statement, coupled with a January 10, 1977 quote in NSC's Financial Statement for the Second Quarter that "exceeding last year's total earnings will be a challenge," comprise what the Court may consider to be a retraction from the projection of July 9, 1976, or at least places the plaintiff on inquiry notice.

it and is a genuine issue in this litigation." *Philadelphia Electric Co. v. Anaconda American Brass Co., supra,* at 458. The issues of fact and law common to the proposed class and which are invested with this warrant of merit are specifically delineated as follows: Common questions include whether the defendants engaged in a course of conduct violative of the federal securities laws, the fact of the alleged misrepresentations and non-disclosures and their materiality, and the general liability of the defendants for such misrepresentations and non-disclosures as are ultimately proven.[14] These questions will be examined within the framework of *Thomas v. Duralite Co., Inc., supra,* earlier related and other existing securities case law standards such as, for example, *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1974); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1973); *S.E.C. v. Texas Gulf Sulphur,* 401 F.2d 833 (2d Cir. 1968).

The Court notes that the class period which will be certified does not coincide completely with the dates for which the plaintiff was recorded as an owner of NSC common shares of stock. The plaintiff did not purchase his 500 shares until October 1, 1976, approximately three months after the initial, alleged misrepresentation which operates as the polestar for the commencement of the class period. The class period, however, is not defined by the arbitrary dates of purchase but rather by the facts existing in the case. A number of decisions in this and other judicial districts have recognized the concept that a class may be determined beyond the dates of purchase of its representative.[15] *See, e. g., Green v.*

*Wolf Corp.,* 406 F.2d 291 (2d Cir. 1968); *Byrnes v. IDS Realty Trust,* 70 F.R.D. 608 (D.Minn.1976); *Muth v. Dechert, Price & Rhoads,* 70 F.R.D. 602 (E.D.Pa.1976); *Aboudi v. Daroff,* 65 F.R.D. 388 (S.D.N.Y.1974); *Kramer v. Scientific Control Corp.,* 64 F.R.D. 558 (E.D.Pa.1974); *Siegal v. Realty Equities Corp. of New York,* 54 F.R.D. 420 (S.D.N.Y.1972). More particularly, in cases involving a protracted course of conduct beyond the ownership dates of the class representative. *See, e. g., Cohen v. Uniroyal, Inc., supra.*

4. *Typical Claims or Defense.* The final consideration in the Court's initial examination of the proposed class concerns whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." F.R.Civ.P. 23(a)(3). It is in this area that the defendants most strongly assert the inappropriateness of a class certification. Essentially, the defendants contend that the plaintiff's claim is not typical to the general claim of the class because the plaintiff may be subject to individual defenses. Most significantly, the defendants contend that the plaintiff relied on the oral representations of Muff and not upon the alleged misrepresentations of the defendants. Moreover, the materiality of these alleged misrepresentations is questioned.

For purposes of discussion,

*[t]he typicality requirement of 23(a)(3) has often been equated with the requirement of 23(a)(4) that the representative party must adequately represent the class. Both requirements are intended to insure that plaintiff will present the claims of class members. By requiring typicality, the Rule insures that each class member's claim will be represented.*

14. The primary misrepresentation relied upon by the plaintiff is the July 9, 1976 statement of projected fiscal-year 1977 earnings. Essentially, it would appear, at this preliminary stage, that the following statements and periods of non-disclosure are secondary links to the main link of the chain and thus are interdependent and reliant upon one another before recovery may be procured. If a link in the chain becomes uncoupled so too may some initial class

members, in which case the Court will utilize its authority to restructure the class without prejudice accruing.

15. The Court has earlier disposed of any concerns that the plaintiff would not suffice as an adequate class representative and thus the focus here is on whether the issues would be common in light of the lack of overlap in the time period.

The adequate representation requirement goes toward insuring that the plaintiff's interests are not adverse to the other class members and that the representative's interests are coextensive with those of other members. 3B Moore's Federal Practice ¶ 23.06–2, at 23–325 (1975). *See also Sommers v. Abraham Lincoln Federal Savings & L. Ass'n,* 66 F.R.D. 581, 587 (E.D.Pa.1975). (Emphasis added).

*Cohen v. Uniroyal, Inc., supra,* at 691.[16] Thus, the Court's focus is not upon the merits of a number of issues necessarily proved before the plaintiff may successfully recover but upon whether the overall scenario is sufficiently similar or "typical" to ensure that the plaintiff will represent the claims of the class during the course of this litigation.

■■■ The Court earlier discussed the plaintiff's allegation that the course of conduct of the defendants constituted a single, unitary scheme or common nucleus of operative facts. It is this contention that must be proven by the plaintiff and which comprises the central meeting ground of all potential class members' interests. Therefore, although issues exist that digress uncommonly or atypically from this central theme, the Court believes and so holds that the crux of the claims are typical with one another to ensure that the plaintiff will not neglect interests of some of the potential class members. This opinion is consistent with the requirements of F.R.Civ.P. 23, the pronouncement recognizing the credibility of a "course of conduct" allegation from *Blackie v. Barrack, supra,* and several case law decisions in this district.

In *Simon v. Westinghouse Electric Corp., supra,* the court was confronted with allegations similar to those presented here. The plaintiffs argued that the defendants were engaged in a course of conduct involving both misrepresentation and non-disclosures that prompted inflated values of the defendants' stock. When discussing the typicality requirement, the court declared:

> *Although each purchaser is not identically situated, all share a common inter-est in showing that the price of Westinghouse stock was unlawfully inflated. At least to this extent, the named plaintiffs' claims are typical of claims of other class members.* Moreover, conflicts between buyers and sellers, or between sellers and those who continued to hold relate only to damages, and thus are peripheral to the central issues in this case. Such conflicts potentially are presented in every securities fraud case involving a prolonged class period, but have been rejected consistently by the courts as grounds for denying class certification. *See Blackie v. Barrack,* 524 F.2d 891, 908–12 (9th Cir. 1975); *Herbst v. ITT,* 495 F.2d 1308, 1314 (2d Cir. 1974). (Emphasis added).

*Simon v. Westinghouse, supra* at 484. An identical holding exists in *Cohen v. Uniroyal, Inc., supra* at 692, a case involving similar facts:

> Even without the benefit of a great deal of evidence adduced through discovery, it is apparent that there will be some dissimilar fact situations among the class members. Yet such dissimilarities do not require a decision that certification is inappropriate here. *The essential issue is whether defendants' conduct constitutes a course of business conduct violative of § 10(b) and Rule 10b–5; as that issue is typical of those of absent class members, the typicality requirement is satisfied. Accord, In re Sugar Industry Antitrust Litigation,* 73 F.R.D. 322, 338 (E.D.Pa.1976) (Emphasis added).

See also *In re Caesar's Palace Securities Litigation,* 360 F.Supp. 366 (S.D.N.Y.1973).

The philosophy expressed in this and other judicial districts considers claims typical when the "essence" of the allegations concerning liability, and not the particularities, suggest adequate representation of the interests of the proposed class members. It may be that individual issues may arise during the course of this litigation in accordance with the defendants' contentions but this is a matter that would be more appropriately considered when the Court determines whether common issues predom-

---

**16.** The Court has considered the requirement of adequate representation and has found both the plaintiff and his counsel sufficiently qualified. *See* Section III. A. 2. *supra.*

inate amongst the class members. If the issues arise during summary judgment or trial stages, the Court may conduct separate hearings or divide the class into subclasses. *See, e. g., Sharp v. Coopers & Lybrand,* 70 F.R.D. 544 (E.D.Pa.1976). Adequate provision is made in the rules for the Court's adjustment of this litigation according to the facts as they arise.[17]

### B. *F.R.Civ.P. 23(b) Requirements.*

1. *Predominance.* In addition to satisfying the requirements of subsection (a) of Rule 23, the plaintiff also has the burden of showing compliance with one of the three requirements of subsection (b). *Boston Pneumatics, Inc. v. Ingersoll-Rand,* 65 F.R.D. 61 (E.D.Pa.1974). The provisions of F.R.Civ.P. 23(b) are as follows:

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the *questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.* The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims' in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. (Emphasis added).

In relation to the present case, the third possible prerequisite is the most applicable.

The Court has earlier ruled that the issue whether the defendants engaged in a course of conduct to inflate the value of NSC common stock in a manner violative of the federal securities laws is common to the proposed class. Although the defendants may agree that this common issue exists, they assert that several individual issues negate any possibility that it may predominate. Issues concerning damages, reliance and due diligence constitute these individual issues which the defendants assert as applicable. For the reasons that will follow, the Court declines to adopt the defend-

---

**17.** The defendants have also questioned whether claims may be considered typical when the class represented was not a recorded shareholder during the entire class period. The contention that this lack of overlap defeats typicality was expressly rejected in *Hochschuler v. G. D. Searle & Co.,* 82 F.R.D. 339, 347 (N.D.Ill. 1978):

Defendants further contend that Gordon's interest is atypical because of the date of his purchase. Defendants argue Gordon has no motivation to prove any nondisclosures after the date of his purchase in June, 1973. The date of Gordon's purchase does not render his claim atypical. Defendants' argument on

this point appears to be premised on the fact that if Gordon fails to prove his case he will not be motivated to prove fraud after the date of his purchase. The complaint alleges a common course of conduct conceived long prior to his purchase and continued long after. Taking that allegation as true, as the court is required to at this point in the litigation, *plaintiff will be able to show he was injured by the common scheme which injured subsequent purchasers. In such a situation, the overwhelming weight of authority holds a plaintiff may represent subsequent purchasers.* (Emphasis added).

ants' position that these individual issues negate a finding of predominance and holds that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." F.R. Civ.P. 23(b)(3).

Before specifically discussing the issues that the defendants contend negate a finding of predominance, the Court deems it necessary to note that acknowledgement of their position "would be, in effect, an emasculation of the viability and pliability of the amended rule." *Siegal v. Chicken Delight, Inc.,* 271 F.Supp. 722, 727 (N.D.Cal.1967). To be sure, individual issues arise in all cases requiring a class action, especially one of this dimension and involving a unitary scheme or course of conduct as a common question. But, to allow various secondary issues of the plaintiff's claim to destroy the institution of a class action would render the rule an impotent tool for private enforcement of the federal securities laws. This is clearly contrary to the philosophy espoused in this and other circuits. The Court believes, and so holds that the individual issues present in the case present no difficulty not inherent in every class action securities litigation. *See, e. g., Kronenberg v. Hotel Governor Clinton, Inc.,* 41 F.R.D. 42 (S.D.N.Y.1966).

The defendants first contend that the issue of damages will vary among class members according to the times and prices of purchase and sale and that this issue would dominate recovery in each case. The damages issue is clearly individual to class members, it is acknowledged, but not any more individual here than in any other class action. Notably, it would appear possible, even likely, that computation of an award of damages would be purely a mechanical task performed by assessing differentials in value in purchase and sale prices or by use of some other polestar depending upon the

facts presented during the course of this litigation. In the event that damage awards could not be mechanically computed, the Court always has available the option to "bifurcate this litigation and proceed to trial on all the common elements, and then, if necessary, have individual trials on the damages issue." *In re Sugar Industry Antitrust Litigation, supra,* at 351. *See also Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *In re Master Key Antitrust Litigation,* 528 F.2d 5 (2d Cir. 1975).[18] Because it is generally recognized that an "allegation of damages in a complaint does not restrict class membership only to those who can prove . . . damages," *Dorfman v. First Boston Corporation, supra,* at 472, a finding in the present case that common issues predominate is not negated.

The defendant next contends that the plaintiff and many of the class members will be subject to individual defenses because of their reliance on third parties for advice before purchasing NSC common shares of stock. While there exists some limited authority for this proposition, *see Greenspan v. Brassler,* 78 F.R.D. 130 (S.D.N.Y.1978); *Reilly v. Frederick,* 21 F.R. Serv.2d 163 (N.D.Ala.1976), numerous recent case law decisions have held that individual reliance need not be proven, especially when allegations of non-disclosure exist, because the reliance factor may be "established objectively by a showing of materiality."[19] *Simon v. Westinghouse Electric Co., supra,* at 486, *citing Affiliated Ute Citizens v. United States, supra.* "In any event; '[t]he speculative possibility that the defendants may have a right to show nonreliance for each class member and that they may wish to exercise this right is not enough to defeat a class action.'" *Wolgin v. Magic Marker Corporation,* 82 F.R.D. 168, 174 (E.D.Pa.1979). In essence, therefore,

---

**18.** It has been consistently held that the "need for individual damages calculations does not diminish the appropriateness of class action certification where common questions as to liability predominate." *Wolgin v. Magic Marker Corporation* 82 F.R.D. 168, 176 (E.D.Pa. 1979). *See also Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir. 1977).

**19.** This ruling is particularly relevant, as the Court suggests, in cases involving allegations of non-disclosure. The reasoning is compelling:

Here, we eliminate the requirement that plaintiffs prove reliance directly in this context because the requirement imposes an unreasonable and irrelevant evidentiary burden. A purchaser on the stock exchanges may be

the overwhelming weight of authority suggests that questions of reliance are not considered when determining whether to certify them here.[20] *See, e. g., Rochez Brothers, Inc. v. Rhoades,* 491 F.2d 402 (3d Cir. 1974); *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139 (3d Cir. 1973).

Finally, the defendants contend that the possible lack of the plaintiff's diligence in investigating his stock acquisition is a crucial issue that negates a finding that the common issues previously found predominate. The requirement of due diligence is much like reliance in that both issues may be considered individual, depending upon the factual circumstances presented in each case. The Court recognizes that in *Ernst & Ernst v. Hochfelder, supra,* the Supreme Court "limited § 10(b) and Rule 10b–5 actions to those in which the defendant acts intentionally . . . [and, that as a result], the due diligence test becomes less compelling." *Cohen v. Uniroyal, Inc., supra,* at 695. *See also Straub v. Vaisman & Co., Inc.,* 540 F.2d 591 (3d Cir. 1976).

Thus, if there is a showing of scienter, the investors are only required to act reasonably; the burden of proof rests upon the defendants to show that the class members have not. This court will not speculate as to whether plaintiff can show the requisite intent. This court will also not speculate as to whether defendants can maintain any affirmative defenses. Should factors be revealed indicating that all shareholders are not similarly situated, this court can require separate hearings as to the due diligence issue.

*Cohen v. Uniroyal, Inc., supra,* at 695.

■ As earlier noted, the Court declines to recognize any validity in the defendants' contention that these various, possibly individual, issues negate a finding that the common issues predominate. If it should occur in the future course of this litigation that these issues arise to a position of importance or prominence, the Court may endeavor to hold separate hearings. The present status of the record suggests that such a possibility is remote, however, and thus will be merely tangentially referred to now.

■ *2. Superiority.* In addition to the requirement that common issues predominate, F.R.Civ.P. 23(b) proscribes class action certification unless the court can determine that this method of treatment is superior to other available methods for fairly and efficiently adjudicating the controversy. In this regard, the Court notes that without class certification, proposed class members would be required to bring individual suits in order to gain redress. This would neither be fair nor efficient because, first, individual suits would not involve sufficient losses to justify costs of litigation and, second, if individual suits were brought, court dockets would be unnecessarily overburdened. Therefore, the Court, deems the class action far superior to any alternative method of litigating this controversy.

---

either unaware of a specific false representation, or may not directly rely on it; he may purchase because of a favorable price trend, price earnings ratio, or some other factor. Nevertheless, he relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price—whether he is aware of it or not, the price he pays reflects material misrepresentations.

*Blackie v. Barrack, supra,* at 907.

As a result, the cases of more recent vintage suggest that materiality most probably supports causation because a defendant would be hard pressed to establish that a plaintiff was indifferent to a material fraud. Equally compelling is the fact that such a result would void the necessity of examining the impact of each of the defendants'. misrepresentations upon individual class members. *See generally Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir. 1973); *U. S. Financial Securities Litigation, supra; Herbst v. Able, supra.*

**20.** In *Muth v. Dechert, Price & Rhoads,* 70 F.R.D. 602, 607 n. 10, (E.D.Pa.1976), the court noted a consideration equally applicable here:

We do not decide here that reliance is not an element of liability in this case. We only emphasize that even if it is, it does not foreclose class action treatment of the substantial common questions involved. If it is necessary, proof of reliance can be dealt with in individual hearings without obviating the benefits to be derived by treating this as a class action.

IV. *Class Notice.*

The final consideration for the Court concerns the subject of notice to the class. F.R.Civ.P. 23(c)(2) provides:

(2) In any class action maintained under subdivision (b)(3), the *court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.* The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel. (Emphasis added).

As is evident from the language of this rule, the best notice practicable is required and not necessarily perfect notice. The notice attempt finally undertaken must, of course, be consistent with the due process considerations articulated in *Eisen v. Carlisle & Jacquelin, supra.*

In the present case, the best notice practicable would apparently be obtained by a first class mailing. *See Berland v. Mack,* 13 F.R.Serv.2d 659 (S.D.N.Y.1969). The members of the proposed class may be readily identified by examining the corporate stockholder records of NSC or any other source that contains the stockholder lists. Moreover, this avenue would not be prohibitively expensive. Therefore, the Court finds that the best practicable notice in the instant case is individual notice, the cost of which is to be borne by the plaintiff.

Counsel for the plaintiff shall forward a draft of their proposed notice form to the Court and opposing counsel on or before April 7, 1980. Any objections to the proposed notice shall be filed on or before April 21, 1980.

ORDER

AND NOW, this 21st day of March, 1980, the plaintiff's motion is GRANTED and the class is certified as follows:

All persons other than the defendants herein who purchased NSC common stock during the period of July 9, 1976 to January 28, 1977, and sustained damages thereby, whether by selling such securities at reduced prices, continuing to hold them at reduced market values, or otherwise.

It is FURTHER ORDERED that the plaintiff shall forward a draft of their proposed notice form to the Court and the defendants on or before April 7, 1980. Any objections to the proposed notice shall be filed on or before April 21, 1980.