Wanda **JENKINS**, et al.

v.

**RAYMARK INDUSTRIES, INC. and Raybestos-Manhattan, et al.**

**Civ. A. No. M–84–193–CA.**

United States District Court, E.D. Texas, Marshall Division.

Oct. 16, 1985.

Reconsideration Denied and Interlocutory Appeal Granted Nov. 20, 1985.

Special Master appointed Dec. 20, 1985.

Rex Houston and Paul L. Sadler, Wellborn, Houston, Adkison, Mann & Sadler, Henderson, Tex., Marlin Thompson, Stephenson & Thompson, Orange, Tex., Walter Umphrey and Joseph R. Steele, Provost, Umphrey, McPherson, & Swearingen, Port Arthur, Tex., for plaintiffs.

Richard L. Josephson and Andrew C. Schirrmeister, Baker & Botts, Houston, Tex., Don W. Kent and Gregory Ivy, Buchanan, Barnett, Schofield & Kent, Jack W. Flock and Tom Henson, Ramey, Flock, Hutchins, Jeffers, McClendon & Crawford, Tyler, Tex., Jeff McClure, Butler & Binion, Houston, Tex., Jeffrey S. Lynch, Vial, Hamilton, Koch, Tubb & Knox, Dallas, Tex., and Robert Scott, Sewell & Riggs, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

ROBERT M. PARKER, District Judge:

### I. Introduction

The Motion before the Court seeks certification of a class of all plaintiffs in personal injury asbestos cases pending in the Eastern District of Texas on December 31, 1984. Most of the Defendants (but not all) oppose certification. Certification of a class consisting of litigants in cases already pending would certainly be novel, but it is equally certain that this District has never witnessed anything similar to the docket control problems caused by personal injury litigation involving asbestos-containing products. One is reminded of the classical tragedies wherein the human flaw of an

otherwise super-human hero causes his own undoing. The courts, attempting to provide fair, systematic relief to the parties litigant while other powers of government and sectors of society turn away from the problem, have become so overburdened as to risk denying justice in asbestos cases as well as other types of cases.

On December 31, 1984, there were approximately 893 personal injury asbestos cases involving over one thousand plaintiffs pending in this District. This backlog persists despite such creative judicial efforts as master filings, detailed standing orders, and large-scale consolidations. Plaintiffs and Intervenors here are representatives of a putative class requesting certification under Rule 23(b)(1)(B) or 23(b)(3). Predictions of 200,000 to 400,000 asbestos cases filed nationwide by the end of this century suggest that certification of a class of pending cases would not be "the be-all and the end-all" reduction of the docket. Shakespeare, *Macbeth* I, 6. Certification could, however, dispense with a number of burdens on the present docket "at one fell swoop." *Id.* at IV, 3.

Class certification is contingent upon meeting the requirements of Rule 23 of the Federal Rules of Civil Procedure. Section (a) of Rule 23 delineates the following four prerequisites to a class action: (1) numerosity, (2) common questions of law or fact, (3) typicality of claims or defenses, and (4) adequacy of representation. Fed.R.Civ.P. 23(a).

## II. Rule 23 Certification

### A. Rule 23(a)

#### 1. Numerosity

■ The numerosity prerequisite demands that the class be "so numerous that joinder of all members" would be "impracticable." Fed.R.Civ.P. 23(a)(1). This Court has attempted to consolidate for trial approximately thirty cases in the past and achieved satisfactory results. The joinder of 893 cases for trial, however, would be impossible if not merely impracticable.

Numerosity, practically speaking, is not the determination of a threshold beyond which joinder is impracticable. Numerosity as a prerequisite to certification is simply establishing that the population of the potentional class is beyond that threshold. As Judge Hannum noted in *Peil v. National Semi-conductor Corp.*, 86 F.R.D. 357, 365 (E.D.Pa.1980), "[w]hat is considered "impractical' is, of course, a subjective determination although the indicia of the number of parties involved, the expediency of joinder and the inconvenience of trying individual suits provide guidance." This Court is convinced that the number of class members involved and the inconvenience inherent in a joinder of all 893 cases satisfy the numerosity requirement of Rule 23(a).

#### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class". Fed.R.Civ.P. 23(a)(2). As a prerequisite to certification, commonality has been liberally construed. *See Peil*, 86 F.R.D. at 367. Commonality, as well as each of the prerequisites of Rule 23(a), focuses on whether or not certification will provide a more economical approach to resolution of the underlying disputes than would piecemeal litigation. Certification of a class of pending asbestos-related personal injury suits allows the trier of fact the opportunity to resolve the "state of the art" issues in one trial rather than in 893 trials. Those issues include the questions of when the asbestos manufacturers and distributors became aware or should have become aware of any health risks associated with the use of asbestos products; what steps, if any, they took to ameliorate the risks; and whether or not their actions in ameliorating the risks or failing to ameliorate the risks warrant the imposition of punitive damages.

The state of the art issues must be tried in every asbestos case. Often the issues become entangled in a lengthy debate over the interpretation of scientific literature going back to the beginning of this century. Many times, the same witnesses are called

to testify to the same facts and give the same opinions given in cases that have previously been tried. While the state of the art issues may be common to each case, they are, of course, not the only issues in a personal injury asbestos suit. In addition to proving that an injury-producing, asbestos-containing product was defective under the state of the art in which it was produced, or that such production or distribution was tantamount to negligence, or that the manufacturers intended to fraudulently conceal known risks to end-product users, plaintiff must show exposure to the product and injuries resulting from the exposure. The commonality prerequisite, however, does not mandate that all issues be common, only that common issues exist. A district court sitting in Pennsylvania has held that

> it is not necessary that each question of law or fact be common to every class member. *Axelrod v. Saks & Co.,* 77 FRD 441, 444 (E.D.Pa.1978). Nor is it required, for purposes of Rule 23(a)(2), that such common questions be shown to predominate over individual questions as is required under Rule 23(b)(3)

*Hummel v. Brennan,* 83 F.R.D. 141, 145 (E.D.Pa.1979). Plaintiffs have sufficiently shown a commonality of issues of law and fact.

### 3. Typicality

The typicality prerequisite set forth in Rule 23(a)(3) dictates that the claims "of the representative parties are typical of the claims" of the class. Fed.R.Civ.P. 23(a)(3). Whereas commonality requires common issues across the class, typicality requires that the representatives of the putative class assert claims that will effectively (in terms of judicial economy) typify the claims of other class members. The actual injury suffered by a class representative may differ in degree from that suffered by other members so long as the harm is of the same type. *McQuilken v. A. & R. Development Corp.,* 576 F.Supp. 1023, 1029 (E.D.Pa.1983) (varying damages to landowners' properties caused by construction); *see also In Re: Asbestos School*

*Litigation,* Master File No. 83–0268 (E.D.Pa. Sept. 28, 1984) (printed in Asbestos Litigation Rep., October 5, 1984, at 9051) (Judge Kelly's memorandum opinion and order certifies a nationwide class of school districts seeking to recover costs incurred in asbestos abatement from school buildings) [hereinafter *School Asbestos* ]. Judge Kelly has cited the law in this area as holding that

> claims [are considered] typical when the 'essence' of the allegations concerning liability and not the particularities suggest adequate representation of the interests of the proposed class members. *Peil v. Speiser* 97 F.R.D. 657, 659 (E.D. Pa.1983) (quoting *Peil v. National Semiconductor Corp.,* 86 F.R.D. at 371). In addition, "a Plaintiff's claim is typical if it arises from the same event or course of conduct that gives rise to the claims of other class members and based on the same legal theory." *Paskel v. Heckler,* 99 F.R.D. 80, 84 (E.D.Pa.1980).

*School Asbestos,* Asbestos Litigation Rep., Oct. 5, 1984, at 9051, 9052.

The claims of the class representatives in the case at bar are typical of those asserted in each personal injury asbestos case in the Eastern District. Each representative claims that he or she was harmed by exposure to asbestos-containing products and that the Defendants are liable for such harm under theories of strict liability in tort for the manufacture or distribution of defective products (that defect arising in design or marketing), negligence, gross negligence, and fraudulent concealment. The degree of harm may differ between the representatives and members of the class according to the degree of exposure (if any), the effects of the asbestos disease process, and the nature of the disease contracted by the individual. Nevertheless, the liability claims of the representatives and the concurrent claims for punitive damages are sufficiently typical to those asserted by the members of the class to meet the typicality prerequisite of Rule 23(a)(3).

4. Adequacy of Representation

The fourth prerequisite of Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). In application, the prerequisite embraces two distinct elements. The first concerns the qualifications of counsel, and the second concerns the relationship between the interests of the class representatives and the interests of the other class members.

The attorneys for the putative class have practiced before this Court for a number of years in all facets of personal injury litigation including asbestos litigation. Counsels' involvement with the trial of asbestos cases in the Eastern District includes the landmark *Borel v. Fibreboard Paper Prod-* *ucts Corp.,* 493 F.2d 1076 (5th Cir.1973), *cert. denied* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). The three law firms advocating the position of the class represent the vast majority of the underlying asbestos cases filed in the Eastern District. Having taken judicial notice of the qualifications of the attorneys for the plaintiffs, this Court is convinced that these attorneys more than adequately represent the interests of the class.

The second element of Rule 23(a)(4), the "representativeness" of the class representatives, is satisfied in the case at bar as their interests are sufficiently aligned with those of the other class members. The plaintiffs' motion for certification lists the class representatives as follows:

| Representative Party | Pending Case |
| --- | --- |
| Wanda Jenkins, Kenneth Earl Jenkins, Jr., Johnny Lynn Jenkins, Timothy Gene Jenkins, William E. Jenkins and Velva Curtis Jenkins | Case now pending under Docket No. TY–81–205–CA of the Beaumont Division of the Eastern District of Texas. This suit involves the death of Kenneth Jenkins from asbestos-related cancer. |
| Antonette L. Malmstead, Brenda Stovall and Glenda Price | Case now pending under Docket No. B–84–294–CA of the Beaumont Division of the Eastern District of Texas. This suit involves the death of Ralph Malmstead from asbestos-related cancer. |
| Mary Mock | Case is now pending under Docket No. M–79–174–CA of the Marshall Division of the Eastern District of Texas. This suit involves the death of Esker Mock from asbestos-related cancer. |
| Robert J. Hebert and wife, Pearl Hebert | Case now pending under Docket No. B–83–74–CA of the Beaumont Division of the Eastern District of Texas. This suit involves injuries to Robert J. Hebert from exposure to asbestos. |
| Calvin Harris and wife, Alice Harris | Case now pending under Docket No. M–82–15–CA of the Marshall Division of the Eastern District of Texas. This suit involves injuries to Calvin Harris from exposure to asbestos. |
| Harriet M. Corrigan | Case now pending under Docket No. B–83–526–CA of the Beaumont Division of the Eastern District of Texas. This suit involves injuries to Harriet M. Corrigan from household exposure to asbestos. |
| Pearl Ratton, Diann Stringer and Margie Smith | Case now pending under Docket No. B–82–246–CA of the Beaumont Division of the Eastern District of Texas. This suit |

| | |
|---|---|
| | involves the death of Harry Ratton from asbestos-related cancer. |
| Lional McGee, Jr. | Case now pending under Docket No. B–84–726–CA of the Beaumont Division of the Eastern District of Texas. This suit involves injuries to Lional McGee, Jr., from exposure to asbestos. |
| Gladys Faulkner, Joyce Marie Buckus, Margaret Ann Hargrove and Sharon Nell Graham | Case now pending under Docket No. B–82–247–CA of the Beaumont Division of the Eastern District of Texas. This suit involves the death of Leroy Faulkner from asbestos-related cancer. |
| Victor L. Easley | Case now pending under Docket No. B–84–1126–CA of the Beaumont Division of the Eastern District of Texas. This suit involves injuries to Victor Easley from exposure to asbestos. |

They are joined by the following three additional representatives by way of intervention:

| Representative Party | Pending Case |
|---|---|
| Joseph J. Palermo, et ux. | Case now pending under Docket No. B–82–273–CA of the Beaumont Division of the Eastern District of Texas. This suit involves the mesothelioma of Mr. Palermo contracted through the use of asbestos products. |
| Rudolph Ronsonette, Jr., et ux. | Case now pending under Docket No. B–83–624–CA of the Beaumont Division of the Eastern District of Texas. This suit involves injuries to Rudolph Ronsonnette, Jr., from exposure to asbestos. |
| Phyllis J. Martinez | Case now pending under Docket No. B–83–692–CA of the Beaumont Division of the Eastern District of Texas. This suit involves injuries to Phyllis J. Martinez as a result of exposure to asbestos particles which were brought home on the clothes of her father. |

The representatives offer a sampling of cases that are significantly similar to the other 893 cases pending. While no two cases are alike, the class representatives here present a spectrum of varying exposures to asbestos containing products and stages in the disease process. That cross-section of interests is substantially similar to the class as whole so as to meet the requirements of 23(a)(4).

**B. Rule 23(b)**

**1. Limited Fund**

■ Plaintiffs seek certification of a mandatory or optional class under Rule

23(b)(1)(B) or Rule 23(b)(3), respectively, or some combination of the application of the two provisions. In order to maintain a mandatory action under 23(b)(1)(B) the rule requires that "the prosecution of separate actions ... would create a risk of ... adjudications with respect to individual members of the class which would as practical matter be dispositive of the interest of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests...." Fed.R.Civ.P. 23(b)(1). This language has given rise to the so-called "limited fund" class action. With regard to this rule, the Advisory Committee has commented that

> [i]n various situations an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or against representative members to settle validity of the claims as a whole, or in groups, followed by seperate proof of the amount of each valid claim and proportionate distribution of the fund, meets the problem.

Fed.R.Civ.P. 23(b)(1)(B) Advisory Committee Note (1966 Amendments) (citations omitted).

In order to determine if the "asbestos fund" is so limited as to deny some members of the putative class recovery because the recovery of other members has depleted the fund, this Court must attempt to compare the existing caseload to the existing resources which could be drawn upon to satisfy meritorious claims.

Estimations of the potential number of personal injury asbestos suits are staggering. The Rand Corporation's Institute for Civil Justice has reported that

> [a] major study completed in 1981 by Irving Selikoff and his associates for the Department of Labor estimated that 21 million U.S. workers are still alive who were significantly exposed to asbestos over the last 40 years, and project 200,-000 excess deaths (above the number normally expected in the population) by the end of the century from asbestos-associated disease. Other estimates of the number of deaths allegedly due to asbestos over the next 30 years have recently been made. All are large—from 74,000 to 265,000. Far more numerous than cancer deaths are the injuries from asbestosis: over three-quarters of the closed claims have been based on injury from asbestosis instead of lung cancer or mesothelioma.

> We found that approximately 24,000 claimants had initiated lawsuits as of March, 1983 alleging injury from exposure to asbestos. Very few had filed ordinary liability insurance claims without filing a lawsuit. Estimates of the number of asbestos lawsuits that will be filed in the next 30 years range from 32,000 to 200,000.

J. Kakalik, P. Ebener, W. Felstiner, G. Haggstrom & M. Shanley, *Variation in Asbestos Litigation Compensation and Expenses* 3–4 (1984) (citations omitted) [hereinafter cited as *Rand Report 1984*].

Estimations of the costs of these lawsuits are equally staggering. In an earlier report the Rand Corporation projected that

> [a]bout $1 billion in compensation and litigation expenses was spent on asbestos product litigation as of the end of 1982, of which about one-third was paid by defendants and two-thirds by insurers. Of total compensation paid by defendants and insurers, 41 percent was used by plaintiffs for litigation expenses.

J. Kakalik, P. Ebner, W. Felstiner & M. Shanley, *Costs of Asbestos Litigation*, 38 (1983) [hereinafter cited as *Rand Report 1983*]. Perhaps more importantly, Rand has calculated that "the total costs to defendants and their insurers averaged about $95,000 per closed claim." *Rand Report 1983* at viii. These calculations lead Rand's Institute for Civil Justice to conclude that the

> [e]xposure to asbestos and consequent litigation involve potentially enormous

personal and economic stakes: [a]pproximately 24,000 people had filed product liability lawsuits claiming asbestos-related injury as of March 1983. Many times that number have been exposed to asbestos, and the potential liability of the defendant firms may run into the billions of dollars. Three major corporations already have filed Chapter 11 bankruptcy petitions identifying the costs of asbestos litigation as one of the reasons for filing. These costs (both compensation payments and litigation expenses) are a major concern to the claimants, the defendants, their insurers, and the public.

*Rand report 1983* at v.

Recently, another major asbestos defendant has declared bankruptcy bringing the total now to six. Others are likely to consider the alternative. *See* Note, *Mass Tort Claims and the Corporate Tortfeasor: Bankruptcy Reorganization and Legislative Compensation Versus the Common Law Tort System,* 61 Tex.L.Rev. 1299 (1983). One must view the magnitude of potential claims against the backdrop of claims presently filed. Typically, plaintiffs in these cases seek actual damages against as many as twenty defendants and punitive damages against four or more defendants. An average complaint may allege as much as two million dollars in total damages. However, "... without more, numerous plaintiffs and a large *ad dannum* clause should (not) guarantee (b)(1)(B) certification." *Payton v. Abbot Labs,* 83 F.R.D. 382, 389 (D.Mass.1979).

At some point, the money will run out. Without extensive discovery, that point is difficult to determine. The motion for class certification before this Court addresses only pending claims in the Eastern District of Texas. Potential claims are not directly involved. Thus, unless the brink of insolvency will be reached during the litigation of the pending 893 claims, a limited fund does not exist as to these claimants. The determination of the existence of a limited fund involves a rough evaluation of the value of the pending cases and a comparison of this evaluation to an estima-

tion of the pool. In addition, that determination must necessarily include the indirect effect of potential claims because of the expected depletion of the fund during the time it will take to resolve the pending 893 cases.

Affidavits of Plaintiffs' counsel indicate that the average total settlement for an asbestos case (based on more than 240 settled cases) is between $138,659.00 and $197,927.42. The affidavits estimate that the average verdict for an asbestos case is between $283,867.00 and $509,446.18. Verdicts have ranged from three million dollars for a plaintiff to a verdict for the defendants.

The district court in *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718, 726 (E.D.N.Y.1983) set forth the standard for establishing a likelihood of insolvency as one of "a substantial probability." The type of evidence that should be received on the propensity of the insolvency was delineated by the Ninth Circuit in *In re Northern Dist. of Cal., Dalkon Shield, Etc.,* 693 F.2d 847, 852 (9th Cir. 1982): "Rule 23(b)(1)(B) certification is proper only when separate punitive damage claims necessarily will affect later claims. The District Court erred by ordering certification without sufficient evidence of, or even a preliminary fact finding inquiry concerning [defendant] Robins' actual assets, insurance, settlement experience and continuing exposure."

This Court granted Plaintiffs' motion for compelled discovery regarding the available insurance coverage, the financial worth of the Defendant Companies, the number of cases filed and pending against each Defendant, and the average settlement per case. The compelled information was provided to the Plaintiffs (except for the information produced *in camera* regarding the financial worth of three closely held corporations) for analysis by the financial expert of their choice and in turn to the Defendants for controverting analysis. Plaintiffs' expert estimated the total fund, including all available insurance coverage and financial worth of the Defendant Com-

panies, at $7,006,900,000.00. Plaintiffs do admit that the figure could be much higher. Defendants' expert projected the fund to contain at least $11,855,834,00.00. Both parties calculate that over $1.7 billion exists in insurance coverage alone.

The *Dalkon Shield* requirement that the trial court receive evidence on a defendant's "settlement experience" was interpreted by this Court to mean that an attempt should be made to calculate the average settlement cost per case. Defendants have estimated the average settlement per case at $79,502.00. This figure represents the Defendants' experience across the nation. As noted above, the Plaintiffs estimate the figure to be some where between $135,000.00 to $200,000.00 based on experience in the Eastern District of Texas. Multiplying the number of class members by the average settlement suggests an estimated settlement value of the putative class at between $72 million and $179 million. This figure is well below the available insurance coverage. Indeed, the sum of $2.68 billion, representing the highest verdict experience in the Eastern District ($3 million) multiplied by the number of class members is also well below either side's projection of the total fund (even without adding the coverage and assets of the closely held Defendant Corporations).

Plaintiffs have not shown that there is a substantial probability that a limited fund exists such that recovery by one member of the class might impair or impede recovery by another member of the class. Admittedly, the above calculations of the size of the fund are crude. The Court does not have available the resources needed to gauge the duration of the fund. Any true estimation of the fund must observe the relative depletion of the fund by litigation in other jurisdictions coextensive with the projected depletion by members of the putative class. The fund may be sufficient to compensate the present class alone but insufficient to compensate the present class and all other claimants with cases presently pending in other jurisdictions. If tried separately at the pace with which we are presently able to proceed with these cases,

it could well be that a number of these putative class members will go without recovery due to the insolvency of the Defendant Companies brought on in part by the recoveries of fellow class members. *See Agent Orange,* 100 F.R.D. at 720. Predicting the limits of the fund in terms of duration over time would be speculative at this point. The motion for certification of a mandatory Rule 23(b)(1)(B) class is denied.

### 2. Mandatory Class for Punitive Damages

█ Several courts in addressing mass tort situations have fashioned a mandatory class for punitive damage claims while maintaining an optional 23(b)(3) class for actual damage claims. *See Agent Orange,* 100 F.R.D. at 728; *School Asbestos,* Asbestos Litigation Rep., Oct. 5, 1984 at 9,059; *compare Dalkon Shield,* 693 F.2d at 852 (denying certification because the district court did not receive sufficient evidence on the existence of a limited fund). Plaintiffs urge this Court to certify a mandatory class for the sole purpose of determining punitive damages. The evidence presented to this Court, as noted above, has failed to establish the substantial probability of the existence of a limited fund from which to compensate deserving class members. The allegations of punitive damages present particular problems in this instance and will be discussed more fully below.

### 3. Optional Class

Rule 23(b)(3) delineates the requirements for a type of class action wherein members after receiving notice of the class may choose to opt out of the class action under 23(c)(2). Rule 23(b)(3) provides that a class may be maintained if in addition to satisfying the prerequisites of subdivision (a)

... the Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The matters pertinent to the findings include: (A) the interest ... in individually controlling the prosecution ... of separate actions; (B) the extent and nature of any litigation ... already commenced by ... members of the class; (C) the desirability or undesirability of concentrating the litigation ... in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

The Advisory Committee has observed that "[s]ubdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* Advisory Committee Note (1966 Amendment). Essentially, 23(b)(3) requires the following two elements: first, the interests of the class must predominate, and second, adjudication by the class must be superior to other methods. *See* 7A C. Wright & Miller, *Federal Practice and Procedure*, § 1777 (1972).

The predominance issue does not revolve around some qualitative or quantitative test for determining whether common questions predominate over the individual matters. *Id.* at § 1778, p. 52. The proper standard for determination of the issue is a pragmatic one in keeping with the objectives of the rule. *Id.* at 53. The common questions need not be dispositive of all issues. *Id.* at 54. Professors Wright and Miller have noted that "when one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper ... even though other important matters will have to be tried separately." *Id.*

More specifically, one district court has certified a class to determine the existence of tort liability despite the fact that individual damage determinations would have to be made for each member of the class. *American Trading & Pro. Corp. v. Fischbach & Moore, Inc.*, 47 F.R.D. 155, 157 (N.D.Ill.1969). Another district court has held that "the 'overwhelming weight of authority' holds that the need for individual damages calculations does not diminish the appropriateness of class action certification where common questions as to liability predominate." *Wolgin v. Magic Marker Corp.*, 82 F.R.D. 168 (E.D.Pa.1979). Similarly, Judge Frankel observed some time ago that "The effective administration of (b)(3) actions will probably require wide use of the already familiar device of split trials." Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 47 (1967).

The common questions of law and fact in the case at hand derive from the state of the art controversy present in any asbestos case. This debate may boil down to a question of when, if ever, did the manufacturers and distributors of dust-producing, asbestos-containing, insulation products become aware of the health risks, if any, associated with the end-uses of the products. In the context of a products liability cause of action, this issue is of increased legal significance because manufacturers and sellers of products are held to the knowledge of an expert in determining whether they knew or should have known of such risks. *See Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir.1984); *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076, 1088–89 (5th Cir.1973). In the context of a gross negligence claim for punitive damages, the state of the art issue is of increased legal significance because any conscious disregard for the welfare of end-product users may give rise to exemplary damage awards for gross negligence in failing to warn the users of any unreasonably dangerous products. *See Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1317–19 (5th Cir.1985) (discussion of the admission into evidence of the "Sumner Simpson papers," letters to and from a Raybestos-Manhatten executive and the editor of *Asbestos* magazine allegedly establishing knowledge and cover-up of the risks of asbestos exposure as early as 1935); *Hansen v. Johns-Manville Products*

*Corp.*, 734 F.2d 1036, 1039–40 (5th Cir. 1984) (admitting Sumner Simpson papers amounted to harmless error as such evidence was cumulative).

Unlike the (a)(2) prerequisite, (b)(3) requires more than a mere showing that common question of law and fact exist. C. Wright & A. Miller, *Federal Practice and Procedure* § 1778, p. 52 (1972). The common questions must predominate over the individual questions. Here, the individual questions are the separate exposure of each claimant and the degree of injury resulting from that exposure. Resolution of the state of the art issues by way of class action consideration would be the most efficient use of public and private resources as state of the art is the most significant contested issue in each case. The threshold questions upon which liability may attach are bound up in the resolution of the state of the art issues. The individual case concerns of exposure and damages can be protected through adoption of a procedure of mini-trials to be held after the class-wide determinations on state of the art. Individual interests are further protected by the opt-out provision of 23(c)(2) and by the fact that most of the plaintiffs comprising the class are, in fact, represented by counsel for the class in the underlying lawsuits previously filed in the Eastern District.

In determining whether the common issues in this case predominate the individual issues, one cannot escape the Advisory Committee's comment that

> [a] mass accident resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances, an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

Fed.R.Civ.P. 23(b)(3) Advisory Committee Notes (1966 Amendment). A number of courts have adopted the Advisory Committee's position. *See Dalkon Shield*, 693 F.2d 847; *Payton*, 100 F.R.D. 336, *Mertens v. Abbott Laboratories*, 99 F.R.D. 38 (D.N.H.1983); *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78 (M.D.Pa.1974); *Yandle v. PPG Industries, Inc.*, 65 F.R.D. 566 (E.D.Tex.1974).

In *Yandle*, Judge Steger found that the interests of a putative class of asbestos workers who were former employees of one particular asbestos plant did not predominate over the individual interests of the class members in pursuing their individual claims. The years since the *Yandle* decision have altered that balance. In the case at bar, denial of the motion for certification would result in great cost due to the litigation and re-litigation of the state of the art issues. At the time *Yandle* was decided, just one year after the Fifth Circuit's decision in *Borel*, few were predicting the geometric rise in asbestos case filings. Resolution of the common issues in these cases would go a long way toward reducing the burgeoning asbestos docket. Further, it appears that the interests of the individual claimant in pursuing his own case can be protected without permitting the proposed mini-trials to "degenerate into multiple lawsuits" that would thwart judicial economy.

In rejecting the position taken by *Yandle* and the Advisory Committee, Chief Judge Weinstein in *Agent Orange* focused on the effects of certification on "litigation economies." *Agent Orange*, 100 F.R.D. at 723. In the case at bar, determining the greatest judicial economy and efficiency yields a balance wherein the issues common to the class predominate over those of the individual claimant. In support of such a determination, Chief Judge Weinstein notes that

> [p]laintiffs have increasingly sought to use class actions to redress injuries caused by a single product manufactured for widespread use. A number of courts have seen the class action as the only alternative "to trying … virtually identical lawsuits, one-by-one," resulting in the bankruptcy of "both the state and federal

court systems." Williams, Mass Tort Actions, 98 F.R.D. 323, 324 (1983).

While the products in question here number more than one, the state of the art defense common to each suit establishes a predominating identity of interests sufficient to warrant certification.

As the *Jackson* and *Hansen* opinions indicate, punitive damages have presented problems in the asbestos context. In assessing the interests of the individuals in pursuing their own claims, punitive damages present a particular problem under the law of Texas. Texas requires that there be a reasonable relationship between any punitive damages and any compensatory damages awarded to a particular claimant. *See Nabours v. Longview Savings and Loan Association,* 700 S.W.2d 901 (Tex.1985); *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981); *Southwestern Investment Company v. Neeley,* 452 S.W.2d 705 (Tex.1970); *Neeley v. Bankers Trust Company of Texas,* 757 F.2d 621 (5th Cir.1985); *Maxey v. Freightliner Corp.,* 665 F.2d 1367 (5th Cir.1982). The Defendants ·opposing certification assert that certification should be denied because any award of punitive damages to the class will have to be made before individual compensatory awards are made.

The procedure envisioned here, however, will adequately insure a reasonable relationship between actual and punitive damages. First, the class representatives are just that—representatives. The merits of their entire claims, including any award for actual damages, will be made at the time of the trial of the class.action. The Court will be able to analyze the establishment of any limited punitive fund under traditional standards of excessiveness by comparing the compensatory awards to the representatives and the finite number of class members. Second, the fund may be established at the time of the trial of the class action, but no actual award of punitive damages will be made to any individual class member until that class member has received a specific compensatory award; thereby, permitting a second opportunity for judicial review of the relationship between any compensatory and· punitive damages. Establishing the fund is not the same as making individual punitive awards. The class action will only establish a limited, punitive fund to be apportioned among individual claimants at the time of their individual compensatory awards. And third, the class action jury can be instructed as to the principles and policies underlying the Texas requirement of a reasonable relationship between compensatory and punitive damages.

I find that given the procedural safeguards of the opt-out provision and the separate mini-trials, the common issues concerning state of the art predominate over the questions of individual exposure and damages. I also find that the proposed (b)(3) class action is superior to other available methods of resolution of these claims.

Remitting the class members to the prosecution of their individual claims or to consolidated groups of claims would be far more expensive, require far more time, and generally be far less efficient than proceeding with the class action. Appellate rejection of the use of collateral estoppel in these cases renders individual litigation impossible from the standpoint of judicial efficiency. It is interesting that in rejecting this Court's application of the principles of collateral estoppel to asbestos products, the Fifth Circuit foresaw that

[t]his is not the first, nor will it be the last asbestos case confronting this Court ... It is understandable that the district courts will seek ways of eliminating the need to continuously reinvent the asbestos liability wheel in every one of these cases. Considerations of judicial economy demand a more streamlined mechanism for compensating asbestos victims and apportioning liability among those responsible for causing injury. Nevertheless, we hold today that this result cannot be accomplished by ... the proposition that in all cases, asbestos products are unreasonably dangerous as a matter of law.

There may be alternative methods for adjudicating the thousands of asbestos cases facing the courts in a manner that conserves the resources of both the courts and the parties. Nothing in our opinion today should be ready as foreclosing these alternatives.... [w]e do note that the juggernaut of modern technology has repeatedly given life to new concepts in our torts jurisprudence and procedure. Changes have come about both through expansion of the common-law and through legislative enactments. Illustrative of this development are the doctrines of strict products liability, comparative negligence, workmen's compensation, no-fault insurance, consumer protection and the class action device—doctrines which, at the time they were first introduced also seemed novel, startling and revolutionary. Old citadels of jurisprudence have [been] demolished, modified, and redefined to meet the needs of a rapidly changing industrial society; one which confers on its members both benefits and burdens previously unimaginable...

[T]here is an urgent need for new approaches to the national tragedy of asbestos-related disease.

*Migues v. Fibreboard Corp.*, 662 F.2d 1182, 1189 (5th Cir.1981).

Unfortunately, society has progressed more rapidly than the federal court system has developed new concepts and doctrines of torts jurisprudence. Again, this is not the last asbestos case that will confront this Court. Nor is it the only type of case being filed in the Eastern District that is the result of massive exposures to toxic substances. Failure to formulate new procedures now for addressing the problems in asbestos litigation will only augment problems in future toxic tort litigation. I find that certification of a class consisting of cases filed in the Eastern District of Texas by December 31, 1984, by insulation workers and household members alleging injuries from exposure to insulation products containing asbestos and capable of producing dust in installation, use, or removal is

proper and maintainable under Rule 23(b)(3).

### III. Class Action Trial of Pending Asbestos Cases

#### A. Class-Wide Determinations

##### 1. Notice

Pursuant to Rule 23(c)(2), this Court hereby determines that the best notice practicable in this case is for the Clerk of the Eastern District to deliver by first-class mail, a copy of this Memorandum and Order to each attorney representing one or more individuals asserting a claim for personal injuries due to exposure to asbestos-containing insulation products with such cases being filed in the Eastern District of Texas on or before December 31, 1984. Each attorney so notified shall be responsible for informing his or her clients that (a) the Court will exclude the client from the class if a request for exclusion is filed in the above-styled and numbered cause with the Clerk of the Eastern District within ten (10) days of the entry of this Order and (b) the judgment in this case, whether favorable or not, will include all class members of the class who do not request exclusion.

##### 2. Scheduling

In order to expedite the trial of this matter, the Court establishes the following deadlines: (a) all discovery in this case pertinent to the trial of the class as a whole shall be completed by December 31, 1985; (b) all Motions shall be filed with the Clerk by January 15, 1986; (c) pre-trial orders shall be filed with Clerk by February 1, 1986; and (d) the trial of the class-wide portion of this matter shall be specially set for February 10, 1986.

##### 3. Trial of Class-Wide Issues

■ In addition to the merits of the claims of the Class Representatives, the jury will be asked to decide the following class-wide issues: (a) which products, if any, were asbestos-containing insulation products capable of producing dust that

contained asbestos fibers sufficient to cause harm in its application, use, or removal; (b) which of the Defendants' products, if any, were defective as marketed and unreasonably dangerous; (c) what date each Defendant knew or should have known that insulators and their household members were at risk of contracting an asbestos-related injury or disease from the application, use, or removal of asbestos-containing insulation products; and (d) what amount of punitive damages, if any, should be awarded to the class as punishment for the Defendants' conduct.

If the Class Representatives are successful on the punitive damages issue, then any award shall be deposited at the direction of the Court in an interest-bearing account and shall constitute a limited punitive fund.

### B. Individual Determinations

■ If the Class Representatives are successful in establishing that any asbestos-containing products were defective, then the members of the class may return to the particular division and the District Judge to which each underlying suit was originally assigned for consolidated mini-trials of four to ten plaintiffs on the issues of exposure to any products previously found to be defective; any damages legally caused by such exposure; and any comparative fault of each plaintiff in incurring such damages.

After establishment of the punitive damage fund, if any, the Clerk shall determine when one-fourth of the cases comprising the class action have been tried or settled and shall divide the punitive fund into four equal quarters. At that time, the Court will award the first quarter of the punitive fund to the first quarter of cases tried or settled. The punitive award shall be made by determining the entire amount of compensatory damages awarded by trial or settlement to the first quarter of the class and determining the ratio thereto of each individual's award. That ratio shall then be used to determine the individual's share of the quarter of the punitive fund to be apportioned. The same procedure shall be employed for each quarter of the class. An individual's punitive award can be depicted with the following formula:

$$\frac{\text{individual's compensatory award}}{\text{total compensatory award for the quarter of the class}} = \frac{X}{\text{a quarter segment of the punitive fund}}$$

Any award the jury makes as punitive damages will, of course, be subject to examination in terms of excessiveness at the time of the establishment of the punitive fund and also at the time that each quarter of the punitive fund is apportioned respectively among one quarter of the class members. If it appears that in apportioning the punitive fund that an individual claimant's share of the fund is not reasonably related to his compensatory damages, then the Court shall refund to the Defendants the excessive portion of the punitive award.

### IV. Conclusion

The Fifth Circuit has discussed at length the unique nature of personal injury asbestos litigation. *Hansen v. Johns-Manville Products Corp.*, 734 F.2d 1036, 1040 n. 4 (5th Cir.1984); *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 526–530 (5th Cir.1984), *withdrawn after reh'g en banc*, 750 F.2d 1314, 1323, and appendices (5th Cir.1985) (original opinion withdrawn and en banc opinion substituted); *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 348 n. 15, and appendix (5th Cir.1982); *Migues v. Fibreboard Corp.*, 662 F.2d 1182, 1189 (5th Cir.1981). Central to each of these discussions is the magnitude of the asbestos caseload, both present and potential. Nevertheless, the caseload and its inherent problems persist.

In its original opinion in *Jackson*, the Court of Appeals noted that

[a] single class action recovery of one award of punitive damages might be an attractive alternative from a theoretical

point of view, but does not appear feasible. Because the losses are so widespread and disparate, the vital legal issues would not be common to all plaintiffs, nor would the applicable legal standards be identical in all jurisdictions in which the cases would arise.

*Jackson,* 727 F.2d at 506 (citations omitted). The approach adopted today by this Court would protect the individual claims of plaintiffs by permitting them to proceed as individuals after the class-wide issues have been determined, and the approach avoids any variance in legal standards by limiting the class to the confines of the Eastern District of Texas. While any punitive fund derivative of the class action certified today would not amount to a single award for all potential punitive claims, it would greatly reduce the number of times the Defendants must defend against the assertion of punitive claims without necessarily diminishing the policy considerations of punishment and deterrence inherent in the law of punitive damages.

The beauty of the classical tragedy as an art form lies in the element of catharsis—the purgation of tension that comes with the spectator's epiphany that he too possesses the flaws that have been responsible for the tragic hero's downfall, but that he may avoid such a fall because he understands the moral of the drama. The moral of the asbestos drama is that without a willingness to adopt new procedures to alleviate problems caused by significant changes in society and the substantive case law, those problems will persist and multiply. I believe we should learn from our past failures and fashion a new procedure for handling the asbestos caseload. Perhaps the optional class certified here can provide the cornerstone for that new procedure. Certainly, I am aware of the amount of public and private resources that will be expended in the initiation of such a procedure. Therefore, the Court invites the parties to file any motions for interlocutory appeal that they deem necessary as well as requests for the Fifth Circuit Court of Appeals to consider the matter on an expedited basis. "If it were done, when tis done, then twere well If were done quickly." *Macbeth* I, 7.

## ORDER DENYING MOTION TO RECONSIDER CLASS CERTIFICATION AND GRANTING INTERLOCUTORY APPEAL

On October 16, 1985, this Court issued a Memorandum and Order certifying a Rule .23(b)(3) class consisting of plaintiffs in personal injury asbestos cases filed in the Eastern District of Texas on or before December 31, 1984. The Court invited the parties to request interlocutory appeal on the order of certification, and the Defendants have filed such a request coupled with a motion to reconsider the order of certification. The motion to reconsider is denied. The motion for interlocutory appeal is granted.

### I. Reconsideration of Certification

### A. Typical, Common Issues Predominate

The Defendants have raised several issues for reconsideration, three of which focus on the Rule 23(a)(2) requirement of commonality, the Rule 23(a)(3) requirement of typicality, and the Rule 23(b)(3) requirement that issues common to the class predominate over individual issues. The Defendants' arguments on these issues go to the heart of the decision of when, if ever, is the class action a proper mechanism to be utilized by the judicial system in handling a number of substantially similar cases that are too numerous for joinder or consolidation. Despite the excellent briefing by Defendants on these matters, this Court is convinced that certification is proper in this instance.

As to commonality and predominance, the Defendants ignore the fact that the state of the art issues, when presented in a trial setting, invariably involve the same witnesses testifying to the same opinions given in earlier cases with the same exhibits. This testimony constitutes the majority of each trial. Frequently, the testimony

is presented in this jurisdiction by way of depositions and trial testimony given in previous cases. Nevertheless, Defendants continue to assert that each asbestos case is unique and requires individual, case by case determination of whether or not the production of asbestos-containing insulation products was defective with regard to the end use by a particular plaintiff. Logic and trial experience teach that management and marketing decisions regarding the production and distribution of asbestos products contemplated end use of insulation materials by a class of persons rather than by any one person.

Defendants are, of course, correct that Texas law and that products liability law in general require proof of defect with regard to an individual consumer. The class action envisioned here does not abrogate that principle. First, the class representatives present the opportunity for a jury to consider product defect as it may (or may not) relate to specific individuals representative of the class. Second, the mini-trials preserve the individual issues of product exposure for each member of the class with regard to each product (if any) found defective in the class action phase. The mini-trial of individual exposure and damages is not a degeneration into "multiple lawsuits separately tried" because the battle over the century of pertinent technical literature and the propriety of punitive damages based on particular defendants' actions in light of that literature is avoided.

It is true that different juries have returned different verdicts in different asbestos cases. It is not at all clear that these differing verdicts are the result of a jury's interpretation of the technical literature in light of a particular end-product user's experience. Different verdicts can be the result of different interpretations of the technical literature or different presentations of the literature. Both of these variables are preserved by the class action mechanism.

The risks inherent in one major trial parallel those in multiple small trials. (Those risks are the key to our system of dispute resolution—despite all of our efforts to develop and advance legal science, adjudication by a jury of our peers, replete with results which are to a point inherently unpredictable, remains the essential element of our judicial system. Indeed many of the efforts to advance legal science such as streamlining trial procedures and the development of mechanisms for handling complex litigation are directed at preserving the elements of risk inherent in a trial where the jury is properly presented with all of the issues effecting a factual determination. The class action preserves those risks concerning the interpretation of the technical literature relating to when the hazards, if any, associated with the use of asbestos-containing insulation products became known or should have become known to the Defendants. In fact, failure to certify the class subjects the system to unwarranted, multiple trials of the identical state of the art issues that would result in injustice to any or all of the parties as well as tremendous expense.) Differing verdicts that have been the result of differing levels of exposure and differing effects of the asbestos disease process can be addressed in the mini-trial of individual exposure and damages. The experience of this Court in some 60 cases has been that the verdicts that have been rendered in favor of defendants have been rendered on the basis of a plaintiff's failure to prove exposure or to prove the existence of an asbestos-related injury. The defendants have not been successful on the state of the art defense.

Defendants are again correct that in the context of a products liability warning case proof of defect involves an analysis of whether or not the warning is effective as to the individual end-product user. *See Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *Pavlides v. Galveston Yacht Basin*, 727 F.2d 330 (5th Cir.1984). The class action certified here preserves these tenets of warnings law by segmenting the consideration of any warnings into two phases: first, adequacy of a warning as determined by a manufacturer's duty

when held to the status of an expert under the scientific literature is to be considered by the jury in the class action phase of the trial, and second, the effectiveness of any warnings that actually reached a particular class member is to be considered in the mini-trial phase as an element of an individual's exposure.

If this Court's experience in previous asbestos cases holds true, this second phase will be largely unnecessary as the cases usually involve "no" warning rather than an "inadequate" warning. When a warning is in fact involved, the exposure phase will effectively address the issue.

The cases that have considered the certification of a class of product liability claims, including those denying certification of a class of single worksite asbestos injuries, have not specifically addressed the trial process envisioned here dividing the trial of common and individual issues. This division ensures that the issues tried as a class concerning elements of product defectiveness predominate over individual issues. The closest published opinion on point, *Yandle v. P.P.G. Industries, Inc.,* 65 F.R.D. 566 (E.D.Tex.1974) was decided in the infancy of asbestos litigation before this District had experienced the docket control problems it is currently experiencing. This Court is convinced that the state of the art and punitive damages issues are common to each asbestos case and predominate over individual issues, and that individual issues can be protected through a series of mini-trials.

As to typicality, I am also convinced that the class action is an effective mechanism for litigating claims typical to those of the representatives. It is not necessary that the claims of the representatives present an equivalency of the types of diseases suffered by other class members. Such a requirement would be tantamount to mandating that each class member have suffered the same amount of damages as the representatives. Claims (not damages) must be typical. The representatives' causes of action must be typical to those of other class members. Here the representatives' claims do present a cross section of the claims filed in the Eastern District of Texas sufficiently similar to satisfy the typicality requirement of Rule 23(a)(3) and also a representative spectrum of the types of diseases typically claimed. That is not to say that only insulators or their families are included in the class as previously certified. The class includes those who assert claims of personal injury caused by the application, use, or removal of asbestos-containing, insulation products.

**B. Punitive Damages will be Reasonably Related to Actual Damages**

■ The Defendants raise three major points for reconsideration on the process for awarding punitive damages delineated in this Court's original order granting certification. First, the Defendants argue that an award of punitive damages to the class would be unconstitutional as the representatives do not have standing to assert such a claim. Authority is cited for the premise that standing is a prerequisite to bringing a suit in American jurisprudence. No authority is cited for the argument that punitive damages cannot be awarded to the representatives of a class action.

Punitive damages are frequently awarded in class actions. The process espoused here merely provides a mechanism for distributing any punitive damages awarded to the entire class rather than just to the representatives of the class. The entire claims of the representatives will be tried in the class action phase of the trial; therefore, any punitive damages will be recovered after a representative award of actual damages. Incidentally, the Court reserves any ruling on whether the interest derived upon the placement of any punitive damages awarded into an interest-bearing account should inure to the benefit of the Defendants or to the members of the class. *See Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985).

Second, the Defendants assert that the class action scheme proposed here will deny the Defendants a jury trial on punitive damages regarding each class member.

Again, the argument ignores the functional role of the class representatives. While this Court does not assume necessarily that any punitive damages will be awarded, it can be readily assumed that the class representatives will attempt to put forth evidence showing that punitive damages are recoverable by the class as a whole. Ultimately, the jury in the class action phase will determine any award of punitive damages. The Court will, of course, instruct the jury in the class action phase and the juries in the minitrial phase of the effects of their answers in determining any actual or punitive damages. Such instructions shall permit the juries in both phases of the trial to evaluate any punitive aspect of exemplary damages awarded.

The Defendants' third argument on the propriety of any punitive award relates to a denial of due process in not being permitted to litigate the issue of a Defendant's conscious indifference to each class member. In fact, the issue shall receive a full hearing as mandated by the dictates of due process during the class action phase of the trial. If the representatives can show that a Defendant's actions constituted a conscious indifference to the welfare of the class as a whole, then a class member is entitled to an award of exemplary damages. That award (if any) is made to the entire class and distributed to the individual class members through a series of mini-trials as discussed in the previous order. The Defendants' argument that a Defendant does not receive due process when a class member that settles with the Defendants after the class action phase is considered by the Court in the distribution of any punitive award ignores the fact that the settling class member has previously been found to be entitled to a recovery of exemplary damages as a member of a class entitled to such a recovery.

C. The Defendants' Position Presents Inconsistencies

The motion and accompanying brief requesting reconsideration of the certification order contain internal inconsistencies that weaken the Defendant's position that certification should be denied. The first of these inconsistencies deals with the assertion that the named representatives do not present an accurate portrayal of the diseases suffered by individual class members. The Defendants apparently feel that it is unfair that the class is represented by those members with the best cases. The Defendants also point out that these "best" cases may "escalate" any punitive damages awarded by the classaction jury. Yet, the Defendants argue conversely that the representatives will not adequately represent the interests of the class, and that the class action scheme certified here does not permit a jury determination of the propriety of a punitive award. Clearly, the class action determination of the state of the art and punitive damages issues coupled with the mini-trial determination of exposure, actual damages, and distribution of any punitive award presents a scheme wherein the interests of the class will be protected and the interests of the Defendants in receiving a fair determination of what, if any, exemplary damages are recoverable by the class as a whole will be protected.

The Court anticipates that it will provide the jury with an appropriate instruction that addresses the fact that the class representatives may have better cases than the class as a whole. Such an instruction would only be provided if the Court is persuaded of the existence of disparity after trial.

A second inconsistency in the Defendants' position arises from the argument that the class action phase would be too burdensome to attempt because of the "overwhelming number of diverse issues, the disparate interests and desires of a thousand claimants, the mountains of paper, and the hoards of lawyers, witnesses and bystanders [that] boggle the mind and defy management." Defendants' brief on the motion to reconsider at 31. The Defendants also argue that resolution of the class action by trial would not close each of the cases which make up the membership of the class because the underlying cases include claims against Defendants not

named in the class action. Apparently, the Defendants' position is that trial of the class action will require a vast amount of judicial resources because the trial of individual cases requires a vast amount of judicial resources. They do admit, however, that some new mechanism is needed for dealing with the asbestos problem, whether it be private or legislative, by reducing "burgeoning judicial dockets." *Id.* at 33.

The action the Defendants suggest is for this Court to wait—until Congress acts or until the Wellington Facility comes on line. There is no projection as to when Congress will resolve the asbestos problems facing the federal judicial court system, and Wellington settlements will continue to be only partial settlements as long as a number of major Defendants are not Facility subscribers. I am of the opinion that we have done nothing long enough and that the class action mechanism affords a means for prompt resolution of a large number of claims and is within the proper purview of the Federal Rules of Civil Procedure. It is not at all clear to me that congressional action or the Wellington Facility are functionally inconsistent with the class action mechanism proposed here. We can no longer allow asbestos litigation to creep in its petty pace from day to day.

Defendants' motion for reconsideration in effect asks this Court to conduct 893 trials with the same liability and state of the art witnesses and exhibits on the identical factual and legal points. The same thirty lawyers would inflict on their clients the enormous expense associated with such an approach and would promote the lamentable state of affairs that so far in these cases has seen two-thirds of total dollars spent in asbestos litigation going to the coffers of lawyers and witnesses and one-third to claimants.. In this Court's judgment, to do so would provide the country with a classic example of dispute resolution run-a-muck. We, at the trial and appellate levels, have now since *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334 (5th Cir.1982) acquired sufficient exposure to and knowledge of these cases to attempt to reduce the unacceptable costs of individual trials.

A third inconsistency emerges when one juxtaposes the Defendants' arguments that individual class members should be permitted to pursue their own claims and that the class members are not adequately represented. The vast majority of the underlying cases comprising the class are being prosecuted by the three law firms representing the class. In addition, the Court has permitted, in accordance with the mandate of Rule 23(c)(2)(A), individuals to opt out of the class if they should so desire. It seems to me that many of the Defendants' arguments (including predominance and adequacy of representation), though frequently voiced by defendants in similar contexts, are in fact arguments for the protection of the rights of individual class members whose rights are protected here by the opt-out provision and by the proposed series of mini-trials.

## II. Interlocutory Appeal

Pursuant to 28 U.S.C. § 1292(b) and Rule 5 of the Federal Rules of Appellate Procedure, this Court finds that its' previous order certifying a class of personal injury asbestos cases filed in the Eastern District of Texas on or before December 31, 1984, as well as the order contained herein denying reconsideration of that certification involve controlling questions of law as to which there are substantial grounds for difference of opinion and that an immediate appeal from these orders would materially advance the ultimate termination of the litigation. Accordingly, this Court directs the District Clerk to make a timely application to the Fifth Circuit Court of Appeals for an interlocutory appeal from these orders.

It should go without saying that the order of certification under Rule 23(b)(3) is in the controlling question of law affecting disposition of the 893 claims comprising the class. Precedent has substantially differed over the propriety of the use of the 23(b)(3) class action mechanism in situations involving mass exposure to products containing

toxic substances over a period of time. *Compare In re Agent Orange Product Liability Litigation*, 100 F.R.D. 718 (E.D.N.Y.1983); *Yandle v. PPG Industries, Inc.*, 65 F.R.D. 566 (E.D.Tex.1974). Finally, as noted in the previous order, I am aware of the expense and time that will be required to ultimately resolve the trial of the class action and the subsequent mini-trials. The Court of Appeals, by reviewing this order and the previous order of certification, may materially advance the termination of the litigation by approving or disapproving of this Court's certification of the class and the proposed scheme of a class action trial phase on state of the art and punitive damages issues and mini-trial phase on individual exposure and actual damages.

## APPOINTMENT OF SPECIAL MASTER

### I. INTRODUCTION

■ This Court has previously certified a class of personal injury asbestos cases filed in the Eastern District. Interlocutory appeal has been granted on the certification question. The class consists of approximately one thousand underlying claims and is represented by thirteen individuals and their families. The class action procedure approved by this Court in its orders of October 16, 1985 and November 20, 1985 envisions a class action phase wherein the claims of the class representatives will be tried in their entirety and a fund of any punitive damages owed to the class as a whole will be established. The second phase of the procedure will consist of a series of mini-trials to determine an individual class member's damages and proportionate share of any punitive damage fund established in the class action phase.

The Court has previously determined in its order of certification that the claims of the representatives are sufficiently typical to those of the individual members of the class to satisfy the requirements of Rule 23(a)(3), and that the issues common to the class predominate over individual issues in accordance with Rule 23(b)(3). In the order denying reconsideration of certification, the

Court specifically addressed the typicality issue by noting that

[i]t is not necessary that the claims of the representatives present an equivalency of the types of diseases suffered by other class members. Such a requirement would be tantamount to mandating that each class member have suffered the same amount of damages as the representatives. Claims (not damages) must be typical. The representatives' causes of action action must be typical to those of other class members. Here the representatives' claims do present a cross section of the claims filed ...

Order Denying Motion to Reconsider, Nov. 20, 1985 p. 6.

Before establishing any punitive fund, the class action phase jury will be instructed upon the requirement under Texas law that a reasonable relationship must exist between actual and punitive damages. The jury will also be instructed that any award of punitive damages will be distributed to the entire class through the use of a formula designed to ensure a reasonable relationship between each claimant's actual and punitive damages. Nevertheless, the Defendants have asserted that the representatives' individual cases involve claims for more actual damages than are typically claimed in cases comprising the class and that permitting the representatives to proceed on behalf of the class will unduly escalate any amount of exemplary damages placed in the punitive fund. Of course, the Court has already provided in its previous orders a mechanism for judicial review of the relationship between any actual damages an individual claimant receives and his proportionate share of any punitive fund established. Thus the ill effects of any "escalation" of the amount in the punitive fund during the class action phase can be cured in the award of individual damages. The Court has also previously noted that such escalation may be avoided altogether by instructing the class action jury of any disparity in the claims of the representatives and the claims of the

class members if a disparity has been shown to exist.

## II. APPOINTMENT OF SPECIAL MASTER

The comparison of the claims of the representatives and those of the other class members involves complex factual determinations unique to this litigation. In order to assist the class action jury in it's factual determination of whether or not significant disparity exists between the claims of the class representatives and the other members of the class and for such other matters that may later be referred, the Court hereby appoints Francis E. McGovern as Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure.

## III. DUTIES AND OBLIGATIONS

The Special Master is directed to prepare for the jury a factual report profiling the characteristics of the claims of the class representatives and of the class members. In preparing his report the Special Master should consider each claimant's alleged duration of exposure to dust-producing, asbestos-containing insulation products and which Defendants have been sued in the underlying claims; injury and degree of injury and whether or not injury is disputed; age and age of onset of disease; sex; family position; economic status including whether or not a claimant retired before the onset of disease and whether or not he is still working; medical condition; whether or not each individual has a history of smoking; and such other factors and studies as may be necessary to accurately profile the class. He is further directed to submit for the Court's approval a proposed procedure for the preparation of his report within two weeks after the entry of this Order. The Master shall have all of the rights, powers, and duties provided by Rule 53 and may adopt such procedures that are consistant with this Order and other orders of this Court. In particular, the Master may engage in communications with the parties and may employ such staffing and assistance as is required to fulfill his duties under this order of reference.

The Master shall file a preliminary report with the Court by January 28, 1986. The Master shall file a final draft of the report with copies to the parties on or before March 7, 1986.

## IV. FEES AND EXPENSES

The parties are directed to deposit with the Clerk $25,000.00 to be placed in the registry of the Court for reimbursement of the Master's expenses. Each side shall deposit their porportionate share ($12,500.00) by December 27, 1985. In addition to reimbursement for reasonable expenses approved by the Court, the Master shall be allowed compensation at rates to be fixed by the Court and to be paid to the Master at periodic intervals to be determined by the Court. Costs of reimbursement and compensation may be awarded to the prevailing party as costs of court.

## V. CONCLUSION

It is, therefore, Ordered that Francis E. McGovern be appointed Special Master in the above-styled and numbered and that he produce a report profiling the claims of the class representatives and of the class members. He is directed to submit a proposed procedure for preparation of the report within two weeks of this Order, to submit a preliminary report by January 28, 1986, and to submit a final report by March 7, 1986. The parties are Ordered to deposit $25,000 with the Clerk for reimbursement of the Master's expenses.